987 A.2d 638

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Dennis MILLER, Appellant.**

Supreme Court of Pennsylvania.

Submitted Oct. 30, 2008.

Decided Dec. 28, 2009.

1

Mary Elizabeth Hanssens, Samuel J.B. Angell, Defender Association of Philadelphia, for Dennis Miller.

Gerald P. Morano, Stuart B. Suss, Kelley Lynn Nelson, PA Office of Attorney General, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice GREENSPAN.

This is a capital appeal from an order entered by the Court of Common Pleas of Chester County denying Appellant Dennis Miller's request for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. Appellant was sentenced to death following his convictions for first-degree murder, rape, indecent assault, recklessly endangering another person, possessing an instrument of crime, and flight to avoid apprehension. These charges arose out of the stabbing murder of Appellant's wife in November of 1995. We affirm.

Briefly, the facts underlying appellant's convictions are as follows. On November 18, 1995, Appellant and his wife, Sherry, left their two children, Barbara and Dennis, with Appellant's mother, Agnes Miller, and went to a local bar called Trib's Waystation where they drank some beer and

ingested methamphetamine. During the course of the evening Appellant became visibly upset and angry when his wife spoke to other men or used her cell phone.[1] The couple left the bar at about 1:20 a.m.[2]

The next day, when Appellant and Sherry did not appear at Agnes Miller's home as planned, Ms. Miller became concerned, especially after no one answered the telephone at Appellant's residence. Ms. Miller twice drove to Appellant's home and observed that the doors to the residence were locked, no one answered the door, and that Sherry's car was not there. On November 20, 1995, after speaking to Sherry's mother and learning that she had not heard from Sherry, Ms. Miller filed a missing persons report with the Pennsylvania State Police. After the investigating trooper was unable to locate Appellant or his wife, he and other troopers went to their residence. Once there, they received permission from Ms. Miller to break into the residence. Upon doing so, they discovered the naked body of Sherry Miller lying on a bed in an upstairs bedroom. Her body was covered in blood, her legs were spread, her knees were bent, and there was a blood-covered pillow over her face. Upon discovering the body, the troopers left the residence to wait for a search warrant.

An autopsy of Sherry Miller's body indicated that she had died because she was stabbed over thirty times in her head, chest, arms, and hands. During the autopsy, the tip of a knife was retrieved from her shoulder. The knife from which the tip originated was found in a trash can. The forensic pathologist who performed the autopsy concluded from the position of the body, defensive wounds on the victim's hands, the lack of

1. This was not the first time Appellant had exhibited jealousy with respect to his wife. In July 1994 and April 1995 Appellant pleaded guilty to various crimes arising out of incidents involving Sherry Miller. During the second incident, Appellant held a gun to his wife's head. He pleaded guilty to aggravated assault and received a sentence of nine to twenty-three months incarceration. He resumed living with his wife following his release from jail.

2. Before leaving, Sherry used the telephone in the bar to page a man named Sean Smith. Mr. Smith, who dated Sherry while Appellant was previously incarcerated, shortly thereafter called the bar telephone in response to the page.

blood below her waist, and the lack of seminal material outside her vagina that she had been subjected to intercourse at the time of her death.[3]

An investigation of the residence resulted in the seizure of evidence tying Appellant to the crime including Appellant's bloody palm print on the pillow found covering the victim's face, Appellant's bloody fingerprint on a bandage, and a bloody footprint belonging to Appellant. In addition, investigators noted that the box spring from the bed on which the victim was found was broken and that the murder weapon had a bloody thumbprint on it. While the thumbprint had several characteristics consistent with Appellant's thumbprint, it contained insufficient identifying markers to be positively identified as having been placed on the knife by Appellant. Police also found a note in the kitchen, in Appellant's handwriting, that read:

Now I hope some of Sherry's whore friends learn something from this. I didn't want for it to go this far, but you people don't understand what she put me through. Some know, but they don't want to say something about her. Everybody told her everything I did, but me, I had to find out for myself what she did. All of my so-called friends f—— me one way or another. I had no friends. And I wish I had more time to get even with some of you assholes. I just want to say that you, Larry Brown, I would have killed you, and you, Sean Smith, I told Donny one time before to tell you to leave her alone. I don't know if he did. And if he did, the next time somebody tells you something, you better do what they say. I would have got you too. I hope somebody in my family takes care of Barb, Dennis. I do love you all. I will see some of you in hell.

Appellant fled the area following the crime. He was apprehended six months later in Florida because of a tip authorities received following a report about the crime on the television show "America's Most Wanted."

3. It was explained that had the victim moved following the incident, such movement would have caused bodily fluids to be spread to various other parts of her body.

Following the denial of a motion to suppress and the waiver of his right to a jury trial, Appellant's capital murder trial commenced in September of 1997. At trial, the Commonwealth presented, *inter alia*, the testimony of Michael Torres who for a time was Appellant's cellmate while he was incarcerated on the aggravated assault charge. Torres testified that Appellant often spoke of killing his wife and that on the day Appellant was released from prison he stated, "I'll be back for killing my wife." The Commonwealth also presented the testimony of forensic pathologist, Richard Callery, M.D., who testified that the victim died because of the numerous stab wounds she sustained, which caused severe internal bleeding. The doctor also opined that the victim died while being subjected to forcible intercourse. In his defense, Appellant presented the testimony of a witness who stated that Torres had fabricated his testimony. At the conclusion of the trial, the trial court found Appellant guilty of the above enumerated offenses.

After Appellant waived his right to a jury trial, a penalty hearing was held before the trial court. At the penalty hearing the Commonwealth presented evidence on two aggravating circumstances, namely, that Appellant committed the murder during the perpetration of a felony, in this case rape, 42 Pa.C.S. § 9711(d)(6), and by means of torture, 42 Pa.C.S. § 9711(d)(8). Appellant thereafter asserted that two mitigating circumstances applied: Appellant lacked the capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law, 42 Pa.C.S. § 9711(e)(3), and the "catch-all provision," 42 Pa.C.S. § 9711(e)(8). At the conclusion of the penalty hearing, the trial court found one aggravating circumstance, Section 9711(d)(6), and one mitigating circumstance, Section 9711(e)(3). Upon weighing the aggravating and mitigating circumstances, the trial court fixed the penalty at death. The court formally imposed that sentence on October 27, 1997, together with a consecutive sentence of ten to twenty years incarceration on the rape conviction.

Appellant appealed to this Court arguing that the trial court erred in denying his motion to suppress, the evidence was insufficient to support his convictions for rape and indecent assault, and the aggravating circumstance did not outweigh the mitigating circumstance. This Court affirmed the judgment of sentence on January 20, 1999. *Commonwealth v. Dennis Miller*, 555 Pa. 354, 724 A.2d 895 (1999). Appellant was represented by the same attorney at trial and on appeal.

On October 29, 1999, Appellant filed a *pro se* PCRA petition.[4] The PCRA court entered an order on November 8, 1999, granting Appellant an emergency stay of his death sentence pending disposition of his request for relief under the PCRA. The PCRA court also appointed two attorneys to represent Appellant. On June 7, 2000, Appellant filed an amended petition. He thereafter filed several supplemental petitions and requests for discovery, which included a request for high-resolution scans of the negatives of the photographs of the crime scene. The PCRA court denied Appellant's request for the high-resolution scan of the negatives on July 19, 2002.

On October 17, 2003, the Commonwealth filed its answer and a pre-hearing memorandum requesting that the PCRA court dismiss some of Appellant's claims because they had been previously litigated. On December 31, 2004, the PCRA court, in a written opinion and order, granted in part and denied in part the Commonwealth's request.

An evidentiary hearing was conducted in late October 2003. In the months following the hearing, Appellant filed several motions asking permission to supplement the record with the victim's medical records and documents relating to Michael Torres. The PCRA court denied both requests in written orders filed January 19, 2005, and November 30, 2005. The Appellant also sought permission to present the testimony of Dr. Callery, the forensic pathologist who testified at trial. Appellant sought to present the doctor's testimony to clarify his trial testimony with respect to whether the victim had

4. The matter was assigned administratively to the trial court for disposition (PCRA Court).

18

been raped. Following a hearing, Appellant's request was denied. On June 30, 2007, the PCRA court issued an opinion and order denying Appellant post-conviction collateral relief (PCRA Court Opinion, 6/30/07). Appellant thereafter timely filed the instant appeal.[5] The PCRA Court requested a Pa.R.A.P. 1925(b) Statement, and on November 2, 2007, the court issued a Rule 1925(a) Opinion (PCRA Court Opinion, 11/2/07).

The standard of review applicable to appeals from the denial of PCRA relief requires this Court to ascertain whether the PCRA court's rulings are supported by the record and free of legal error. *Commonwealth v. Fahy*, 598 Pa. 584, 959 A.2d 312, 316 (2008); *Commonwealth v. Stokes*, 598 Pa. 574, 959 A.2d 306, 309 (2008). "In order to be eligible for PCRA relief, [a petitioner] must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found at 42 Pa.C.S. § 9543(a)(2)." *Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 796 (2008).

Appellant raises thirteen issues on appeal including claims that prior counsel failed to provide effective assistance of counsel. In order to be eligible for relief on a claim alleging ineffective assistance of counsel, a defendant must establish that counsels representation fell below accepted standards of advocacy and that as a result thereof, prejudice resulted. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice results when "there is a reasonable probability that, but for counsels unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. In *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987), this Court interpreted the *Strickland* standard as requiring proof that: (1) the underlying claim is of arguable merit; (2) counsel's performance lacked a reasonable basis; and (3) the ineffectiveness of counsel caused the petitioner prejudice. *Commonwealth v.*

5. Jurisdiction is vested in this Court by 42 Pa.C.S. § 9546(d) which mandates that review of the denial of post-conviction relief be conducted by this Court.

*Collins,* 598 Pa. 397, 957 A.2d 237, 244 (2008). A chosen strategy will not be found to have been unreasonable unless it is proven that the path not chosen " 'offered a potential for success substantially greater than the course actually pursued.' " *Commonwealth v. Williams,* 587 Pa. 304, 899 A.2d 1060, 1064 (2006) (quoting *Commonwealth v. Howard,* 553 Pa. 266, 719 A.2d 233, 237 (1998)). Finally, to prove prejudice, a defendant must show that but for counsel's error, there is a reasonable probability, *i.e.,* a probability that undermines confidence in the result, that the outcome of the proceeding would have been different. *Commonwealth v. Sneed,* 587 Pa. 318, 899 A.2d 1067, 1084 (2006) (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). A defendant's failure to satisfy even one of the three requirements results in the denial of relief. *Commonwealth v. Cook,* 597 Pa. 572, 952 A.2d 594, 614 (2008).

Having articulated the standards applicable to appeals from the denial of PCRA relief and claims alleging ineffective assistance of counsel, we turn to a review of the issues raised by Appellant. We have re-ordered Appellant's issues for ease of review in accordance with their relation to the guilt, penalty, or PCRA phases of the proceeding.

## GUILT PHASE ISSUES

### 1. A New Trial Is Warranted Because Trial Counsel Failed to Investigate and Present Evidence Showing that the Victim Was Killed in the Heat of Passion.

Appellant asserts that he should have been granted a new trial because trial counsel failed to investigate and present evidence demonstrating that Appellant killed his wife in the heat of passion. In support of this claim, Appellant faults trial counsel for not calling during trial Dr. Gerald Cooke, a psychologist who had been retained by the defense for the penalty phase. Appellant claims Dr. Cooke would have opined that the killing was consistent with an explosive rage premised on Appellant's "personality makeup, his drug use and everything he told [Dr. Cooke] about the incident". Appellant's Brief, 18 (citing N.T. 10/29/03, 440). Appellant also contends

that trial counsel's representation was deficient because he did not interview or call as witnesses several of Appellant's family members. According to Appellant, these witnesses would have testified that Appellant and the victim had a tumultuous relationship that was fueled by drug and alcohol abuse, that the victim saw other men, that she was impregnated by another man and had an abortion, that knives were kept in the bedroom where the murder occurred, and that the bed was broken prior to the day of the murder. Finally, Appellant states that trial counsel should have presented expert testimony demonstrating that the manner in which the victim was killed (multiple stab wounds) was typical of a "very angry assailant, an emotionally charged assailant," as well as testimony opining that the killing was committed in the heat of passion and that Appellant suffered from brain damage that affected his ability to appreciate the consequences of his actions.[6] Appellant's Brief, 21–22.

Appellant is entitled to no relief on this claim. A person is guilty of "heat of passion" voluntary manslaughter "if at the time of the killing [he or she] reacted under a sudden and intense passion resulting from serious provocation by the victim." *Commonwealth v. Ragan*, 560 Pa. 106, 743 A.2d 390, 396 (1999). " 'Heat of passion' includes emotions such as anger, rage, sudden resentment or terror which renders the mind incapable of reason." *Commonwealth v. Mason*, 559 Pa. 500, 741 A.2d 708, 713 (1999). An objective standard is applied to determine whether the provocation was sufficient to support the defense of "heat of passion" voluntary manslaughter. *Commonwealth v. Laich*, 566 Pa. 19, 777 A.2d 1057, 1066 (2001). "The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was

---

6. At the PCRA evidentiary hearing, Appellant presented the testimony of Julie Kessel, M.D., a psychiatrist, and Charles Wetli, M.D., a medical pathologist. Dr. Kessel testified that it was her opinion that the killing occurred in the heat of passion. Dr. Wetli testified that the manner of killing demonstrated that the killer was angry and emotionally charged. N.T. 10/28/03, 334; N.T. 10/29/03, 531, 546–47.

incapable of cool reflection." *Commonwealth v. Thornton,* 494 Pa. 260, 431 A.2d 248, 252 (1981).

The PCRA court's opinion indicates that trial counsel not only did an "exceptional" job in attempting to establish that the killing was committed in the "heat of passion," but also that the refusal of Appellant to testify handicapped trial counsel because he was unable, without Appellant's testimony, to establish Appellant's state of mind at the time of the killing. The PCRA court wrote:

> Based on the totality of the circumstances, the court finds that trial counsel was not ineffective for failing to establish a heat of passion defense. To the contrary, counsel did an exceptional job of getting evidence and argument regarding heat of passion into the record despite the defendant's refusal to take the stand. Further the testimony of the other alleged witnesses would either have been not admissible or irrelevant and/or not helpful. Thus, trial counsel was not ineffective for failing to call said witnesses during the trial.

PCRA Court Opinion, 6/30/07, 25. The PCRA Court's reasons for rejecting this claim were correct as they indicate that the court had considered and rejected the evidence submitted at trial by Appellant regarding his claim that the killing was committed in the heat of passion and that the additional evidence would have resulted in a different outcome. The reason for this is clear, namely, the additional evidence fails to establish that the killing resulted from a sudden and intense passion resulting from serious provocation caused by the victim contemporaneously with the killing. Once Appellant refused to testify about the events surrounding the killing, he made it virtually impossible for counsel to convince the trial court that the killing was committed in the "heat of passion" insofar as the record lacked any evidence that the killing was the result of some provocative act committed by the victim or that Appellant killed the victim in the "heat of passion" as a consequence of the victim's provocation of him. Under the circumstances, the PCRA did not err in denying relief on this claim.

Even were we to consider the additional evidence and testimony Appellant claims trial counsel was ineffective for not presenting at trial, which concerns his wife's alleged infidelity and their stormy relationship, it is clear that the evidence still was insufficient to conclude that the killing was committed in the heat of passion as the record is devoid of evidence that at the time the victim was murdered, Appellant was acting under a sudden or intense passion brought on by the victim. While Appellant claims that the victim's apparent infidelity and flirtatiousness, when coupled with his own mental state, were sufficient to cause him to act with sudden and intense passion, we note Appellant was well aware of his wife's proclivities prior to the day of the killing and trial counsel introduced evidence establishing this. Thus, the evidence Appellant claims should have been introduced on this issue was merely cumulative of evidence already presented at trial. Moreover, the evidence shows that although Appellant and his wife argued while together at the bar, he calmed down and appeared to be in control of his faculties following the argument. N.T. 9/30/97, 213, 220. Also the note Appellant left at the scene evinces that he had not acted in the "heat of passion" but rather in a calculating manner.

In numerous cases, evidence showing a history of minor disputes and allegations of past infidelity has been held not to be sufficiently provocative to reduce murder to manslaughter. See Commonwealth v. Frederick, 508 Pa. 527, 498 A.2d 1322 (1985) (holding that evidence of a stormy relationship and of an argument between the defendant and his victim earlier on the day of the killing was not sufficient evidence of provocation to require a heat of passion jury instruction); Commonwealth v. Pirela, 510 Pa. 43, 507 A.2d 23 (1986) (holding that defendant, who killed a man defendant believed killed his brother twenty-four hours prior thereto, was not acting under sudden passion); Commonwealth v. Whitfield, 475 Pa. 297, 380 A.2d 362 (1977) (holding argument between defendant and her mother's husband over black-eyed peas and leaving door open, which occurred approximately one half-hour to an hour before fatal stabbing of husband, was not adequate legal

provocation to reduce murder to voluntary manslaughter); *Commonwealth v. Walter Brown,* 436 Pa. 423, 260 A.2d 742 (1970) (holding refusal of wife to return home, which caused husband to lose control and stab her, was not sufficient provocation to justify finding of voluntary manslaughter). In *Commonwealth v. Collins,* 440 Pa. 368, 269 A.2d 882 (1970), the defendant, who claimed that he was provoked to kill his wife because his wife may have seen another man while he himself was incarcerated, argued that it was error to refuse a request that the jury be instructed on heat of passion voluntary manslaughter. This Court found no merit to the claim, stating:

Unfortunately, this evidence, even if true, does not come close to establishing the prerequisites of voluntary manslaughter as set forth in *Commonwealth v. Barnosky,* 436 Pa. 59, 64, 258 A.2d 512, 515:

"To reduce an intentional blow, stroke, or wounding resulting in death to voluntary manslaughter, there must be sufficient cause of provocation and a state or rage or passion without time to cool, placing the prisoner beyond the control of his reason, and suddenly impelling him to the deed. If any of these be wanting-if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder. *Commonwealth v. Drum,* 58 Pa. 9(17)'[sic]; *Commonwealth v. Paese,* 220 Pa. 371, 373, 69 A. 891, 892 (1908), *cited in Commonwealth v. Drum,* 58 Pa. 9[ (]17).'[sic] Com–2d 757, 762 (1968).[sic] *See Commonwealth v. Palermo,* 368 Pa. 28, 81 A.2d 540 (1951); *Commonwealth v. Cargill,* 357 Pa. 510, 55 A.2d 373 (1947)."

*Collins,* 269 A.2d at 885–86.

The foregoing cases make clear that the acts of provocation relied upon by Appellant were simply not acts which society is prepared to recognize as providing sufficient provocation to reduce the crime of murder to manslaughter. Thus, trial counsel was correctly deemed not to have been ineffective for failing to present such evidence.

█ Appellant further argues, however, that when this evidence is coupled with the proposed testimony of the expert witnesses identified above, it establishes that the killing was committed in the "heat of passion." In the absence of evidence about what precipitated the killing, one simply cannot draw the conclusion that Appellant killed his wife in a fit of rage after she provoked him. While Appellant's psychological makeup may have rendered him unable to handle his wife's infidelity and the couple's marital difficulties, absent some evidence that his wife committed an act sufficiently provocative at the time of or very shortly before the killing, the testimony of the expert witnesses was irrelevant. *See Commonwealth v. McCusker*, 448 Pa. 382, 292 A.2d 286 (1972) (indicating that before a defendant's state of mind becomes relevant as to whether there was sufficient provocation, a defendant must first present evidence of provocation). Thus, trial counsel cannot be faulted for failing to introduce the identified expert testimony at trial. In view of the foregoing, we affirm the PCRA court's ruling that trial counsel was not ineffective for failing to investigate and introduce at trial the suggested additional evidence pertaining to whether the killing was committed in the heat of passion.

## 2. Trial Counsel Was Ineffective for Failing to Investigate and Present Expert Testimony to Rebut the Commonwealth's Assertion that the Victim Was Raped.

█ Appellant accuses trial counsel of providing him with ineffective assistance of counsel for not investigating and presenting evidence to rebut the Commonwealth's claim that Appellant raped the victim. Appellant submits that had such evidence been presented, the trial court would have ruled that the evidence was insufficient to support the rape charge.

During the PCRA evidentiary hearing, Appellant presented the testimony of two expert witnesses, Dr. Peter R. DeForest, a professor of criminalistics at John Jay College of Criminal Justice, and Dr. Charles Wetli, Chief Medical Examiner for Suffolk County. Dr. DeForest testified that his examination

of the physical evidence in the case led him to the conclusion that the victim had not been raped. In reaching this conclusion, Dr. DeForest opined that the grounds relied upon by Dr. Callery in finding that a rape occurred, namely, the lack of blood below her stomach, the volume of fluid in her vagina, and the position in which her body was found, were insufficient to prove that a rape occurred, due either to more plausible explanations or the lack of adequate testing. N.T. 10/28/03, 285–91. Dr. DeForest further testified that trial counsel's cross-examination of Dr. Callery was grossly inadequate. N.T. 10/28/03, 292–96. Dr. DeForest indicated that his examination of the evidence and the opinions he rendered were based on scientific principles that were available in 1997 prior to the commencement of trial in this case. N.T. 10/28/03, 300.

Dr. Wetli also testified that there was no evidence of forcible rape. He based his conclusion on the lack of trauma to the victim's genital region and the fact that there was no evidence of strangulation or asphyxiation, which he opined almost always occurs during a forcible sexual assault. N.T. 10/28/03, 330–31. According to Dr. Wetli, the victim's defensive injuries were more consistent with her assailant straddling her chest than with his having intercourse with her at the time. N.T. 10/28/03, 333.

Both Dr. DeForest and Dr. Wetli conceded that they could not rule out that the victim had been forcibly raped. N.T. 10/28/03, 320, 352. During cross-examination, Dr. DeForest qualified his opinion that the position of the victim's body made it unlikely that a rape occurred by admitting that intercourse could have occurred in the position in which the victim was found. N.T. 10/28/03, 307. He also conceded that the defensive wounds found on the victim's body demonstrated that she was resisting the attack. N.T. 10/28/03, 315–16.

Trial counsel testified that based on his experience, he believed that it was not necessary to consult an expert to rebut the evidence that a rape occurred because he did not think that Dr. Callery would be found credible. N.T. 10/27/03, 85–87. Although counsel could not recall what he did in

preparing to cross-examine Dr. Callery, he recalled he did take steps to discredit his testimony.

The PCRA court found this claim lacked merit for several reasons, the most salient one being that Appellant failed to prove that trial counsel's actions lacked a reasonable basis. PCRA Court Opinion, 6/30/07, 9.[7] Trial counsel testified that he did not seek out and retain an expert because his review of the evidence made it pellucidly clear to him that no rape occurred and that it was his belief that anyone who reviewed the evidence would draw the same conclusion he did. N.T. 10/27/03, 85–86. Trial counsel also related that it was his belief that he could rebut and undermine the testimony of Dr. Callery, the Commonwealth's expert witness, with respect to whether a rape occurred without the assistance of an expert witness through skillful cross-examination of Dr. Callery. N.T. 10/27/03, 87. Counsel drew this conclusion from his cross-examination of Dr. Callery at a pre-trial hearing during which he extensively cross-examined the doctor and elicited from him several inconsistencies with respect to whether the doctor was of the opinion, to a reasonable degree of medical certainty, that the murder and the sexual intercourse occurred simultaneously. Thus, the PCRA court concluded that "counsel reasonably thought that he did not need to retain additional experts in this case." PCRA Court Opinion, 6/30/07, 9.

On the basis of trial counsel's testimony, we cannot say that the PCRA court erred in concluding that trial counsel had a reasonable basis for not seeking out an expert witness to rebut Dr. Callery's testimony. This Court's review of matters involving trial strategy is deferential. Trial counsel will be deemed to have acted reasonably if the course chosen by trial counsel had some reasonable basis designed to effectu-

7. The PCRA court also noted that both Dr. DeForest and Dr. Wetli testified that they could not rule out the possibility that a rape occurred. PCRA Court Opinion, 6/30/07, 10–11. Finally, the PCRA court determined that Dr. Wetli's testimony was not entirely inconsistent with Dr. Callery's insofar as Dr. Wetli testified, "the attack and the assault to the vaginal area were concomitant or occurring within the same general time frame." *Id.* at 12. The PCRA court's conclusion, in light of the evidence, is correct.

ate his client's interests. *Commonwealth v. Puksar*, 597 Pa. 240, 951 A.2d 267, 277 (2008). Moreover, a claim of ineffectiveness will not succeed by comparing, in hindsight, the trial strategy trial counsel actually employed with the alternatives foregone. *Id.* Finally, "[a]lthough we do not disregard completely the reasonableness of other alternatives available to counsel, 'the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis.'" *Commonwealth v. Cooper*, 596 Pa. 119, 941 A.2d 655 (2007) (quoting *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987)).

Since the record supports the PCRA court's finding that trial counsel had a reasonable basis for not consulting with an expert witness, Appellant is denied relief with respect to this claim.

3. **Trial Counsel Was Ineffective for Failing to Investigate, Develop, and Present Evidence at Trial Showing that Commonwealth Witness Michael Torres Suffered from a Mental Illness. Relatedly, the Commonwealth Violated *Brady v. Maryland* by Withholding Evidence Related to Michael Torres.**

In this claim, Appellant complains that trial counsel was ineffective because he did not conduct any investigation with respect to Commonwealth witness Michael Torres, Appellant's former cellmate, who testified at trial that Appellant said he would be back in prison for killing the victim. N.T. 9/30/97, 180–81. According to Appellant, at the time he allegedly heard Appellant utter the threat, Torres was manic-depressive and bi-polar, was suffering from auditory hallucinations, and was being treated with psychotropic medication. Such information, Appellant maintains, was contained in various prison records and reports and in a pre-sentence report prepared by Northampton County officials after Torres had been convicted on drug and robbery charges. Appellant submits that trial counsel had an obligation to obtain these documents and could have obtained them had he simply conducted an investigation of Torres. Appellant argues that

trial counsel's failure to investigate Torres entitles him to a new trial because Torres provided the only direct testimony that Appellant acted with premeditation when he killed the victim.

In a related claim, Appellant accuses the Commonwealth of violating the holding of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because it failed to provide the defense with a copy of Torres's pre-sentence report. According to Appellant, the Commonwealth had an obligation under *Commonwealth v. Burke,* 566 Pa. 402, 781 A.2d 1136 (2001), to obtain the pre-sentence report from Northampton County authorities because it contained exculpatory information and was under the control of another governmental agency.

Neither claim entitles Appellant to relief. First, Appellant's attack on trial counsel's stewardship affords him no relief because trial counsel had no reason to believe that Torres was suffering from mental health problems. Although Torres was Appellant's cellmate for two months and spent significant time with Appellant in prison, Torres never told Appellant about his mental problems or acted in a manner suggesting that he had any. In fact, Torres never advised the prosecutor or the police involved in the instant matter about any mental problems. Torres admitted this at the evidentiary hearing held in this matter. N.T. 10/28/03, 224, 227, 235–36, 244.[8]

In addition, the claim does not entitle Appellant to relief because he has not met his burden of establishing that he suffered prejudice because of trial counsel's alleged nonfeasance. According to Appellant, he was prejudiced by trial counsel's failure to investigate Torres because Torres's testimony "was critical to establishing the specific intent element of first-degree murder as [t]here was little else in the case that pointed to any kind of deliberation or premeditation of

8. Torres testified that he became unsure that Appellant threatened to kill his wife after he believed he heard other inmates threaten to kill their wives. Torres stated that he could not tell whether the threats were actually uttered by Appellant and the other inmates or whether they emanated from the voices in his head. N.T. 10/28/03, 225–26.

any kind." Appellant's Brief, 38. Appellant is mistaken. In addition to the use of a deadly weapon on vital parts of the victim's body,[9] Appellant left the incriminating note wherein he admitted that he killed the victim willfully. Thus, Torres's testimony was not as critical as Appellant claims it was with respect to proof that he acted with specific intent to kill.

Additionally, the PCRA court found Torres's recantation and Appellant's ignorance of Torres's mental health problems, including Torres's claim that he was hearing voices while incarcerated with Appellant, incredible because Appellant and Torres were cellmates and spent significant time together. PCRA Court Opinion, 6/30/07, 6–7. The PCRA court also noted that Torres had been threatened while in prison, which prompted prison authorities to move him on two occasions to other facilities after he testified against Appellant. The PCRA court attributed Torres's change of testimony to the threats and a desire to assist a friend and former co-prisoner. Finally, the PCRA court held that trial counsel effectively undermined Torres's testimony by presenting the testimony of a witness who stated that Torres admitted he was going to lie about what Appellant may have said to him in order to help himself. PCRA Court Opinion, 6/30/07, 7. We find that the reasons proffered by the PCRA court support its decision. Accordingly, Appellant has failed to establish that he was prejudiced by trial counsel's failure to conduct an investigation of Torres, and therefore, Appellant is not entitled to relief with respect to this claim of ineffectiveness. *See Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 93 (1998) (holding that where there is support in the record for a PCRA court's credibility determinations, this Court is bound by those determinations).

Appellant's claim that the Commonwealth violated the holding of *Brady v. Maryland, supra,* by failing to provide a copy of Torres's pre-sentence report to the defense lacks

9. The law is clear that specific intent to kill may be inferred from the use of a deadly weapon on a vital part of another person's body. *Commonwealth v. Wright,* 599 Pa. 270, 961 A.2d 119, 130 (2008); *Commonwealth v. Kennedy,* 598 Pa. 621, 959 A.2d 916, 921 (2008).

merit as well. In order to succeed on a *Brady* claim, a defendant must establish that the evidence withheld was favorable to him, *i.e.*, that it was exculpatory or had impeachment value; the evidence was suppressed by the prosecution; and prejudice resulted. *Commonwealth v. Sattazahn*, 597 Pa. 648, 952 A.2d 640, 658 n. 12 (2008). In order to establish prejudice, a defendant is obliged to show that "the evidence in question was material to guilt or punishment, and that there is a reasonable probability that the result of the proceeding would have been different but for the alleged suppression of the evidence." *Commonwealth v. James Dennis*, 597 Pa. 159, 950 A.2d 945, 966 (2008) (citing *Brady*, 373 U.S. at 87, 83 S.Ct. 1194; *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). On this point, this Court has stated, "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *Commonwealth v. Green*, 536 Pa. 599, 640 A.2d 1242, 1245 (1994) (quoting *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). Further, "[t]he mere *possibility* that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Commonwealth v. Chambers*, 570 Pa. 3, 807 A.2d 872, 887 (2002) (emphasis added). Finally, a *Brady* violation will not afford a defendant relief if the defendant either knew of the existence of the evidence in dispute or could have discovered it by exercising reasonable diligence. *Commonwealth v. Morris*, 573 Pa. 157, 822 A.2d 684, 696 (2003).

▇▇ Instantly, Appellant's claim fails for myriad reasons. First, Appellant has failed to establish that the result of the proceedings would have been different had the pre-sentence report been provided to the defense. As noted above, the record was replete with evidence establishing that Appellant was guilty of the crimes he was convicted of committing, including first-degree murder. Thus, Torres's testimony was not crucial to the verdict rendered by the trial court and the verdict would not have been different had the pre-sentence report been provided to the defense.

In addition, the Commonwealth was not required to obtain the pre-sentence report and provide it to the defense because the governmental agency that possessed it was not involved in the prosecution of Appellant. In *Commonwealth v. Burke, supra,* this Court first applied the rule laid down by the United States Supreme Court in *Kyles v. Whitley, supra,* wherein the Supreme Court held that the prosecution has a duty to provide the defense with exculpatory evidence contained in the files of police agencies of the same government bringing the prosecution, even though the prosecution was unaware of the existence of the evidence. The United States Supreme Court, however, limited its holding to those agencies that were involved in the prosecution of the accused. *Whitley,* 514 U.S. at 437, 115 S.Ct. 1555 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). Here, Appellant has failed to establish that the government agency or agencies having possession of the pre-sentence report were involved in the prosecution of Appellant. Consequently, the prosecution herein had no obligation to acquire or provide the report to the defense. Accordingly, we hold Appellant's claim of ineffectiveness and his allegation that the *Brady* rule was violated are meritless and entitle him to no relief.

4. **Trial Counsel Was Ineffective for Failing to Object to the Testimony of Dr. Richard Callery about the Occurrence of Rape Because Dr. Callery's Opinion Fell Below the Standard of Proof Required in the Commonwealth.**

Appellant contends that he is entitled to a new trial because of trial counsel's failure to object to the testimony of Dr. Richard Callery, the Commonwealth's medical expert, regarding whether the victim had been raped. Appellant asserts that trial counsel should have objected to Dr. Callery's testimony on the ground that Dr. Callery failed to state that a rape occurred to a reasonable degree of medical certainty.

A review of the applicable law indicates that "magic words" need not be uttered by an expert in order for his or her testimony to be admissible. *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 728 (1998); *Commonwealth v. Spotz*, 562 Pa. 498, 756 A.2d 1139, 1160 (2000). Rather, the substance of the testimony presented by the expert must be reviewed to determine whether the opinion rendered was based on the requisite degree of certainty and not on mere speculation. *Spotz*, 756 A.2d at 1160.

Trial counsel testified that he did not proffer an objection to Dr. Callery's testimony because three weeks prior to Dr. Callery's taking of the witness stand, Dr. Callery testified during a pre-trial hearing that it was his opinion that a rape occurred and that if he proffered an objection, the Commonwealth would have been permitted to elicit the necessary testimony from the doctor. In addition, trial counsel testified that he did not object, and give the Commonwealth an opportunity to elicit from Dr. Callery the "magic words" because he made the tactical decision to use that omission to argue to the trial court that no rape occurred.

The PCRA Court ruled that this ineffectiveness claim lacked merit because trial counsel had a reasonable basis for failing to object. PCRA Court's Opinion, 11/2/07, 30–31. We agree. Counsel was correct in surmising that an objection likely would have resulted in the Commonwealth seeking and being granted permission to elicit from Dr. Callery his opinion that a rape had occurred herein given that the doctor had offered that opinion prior to trial. Thus, had trial counsel proffered an objection, his strategy to use the omission to argue that there had been no rape would have been negated by the anticipated opinion testimony of Dr. Callery that the victim had been raped. Trial counsel's strategy was reasonable given that had the trial court determined that Dr. Callery's opinion testimony was insufficient to establish a rape because the doctor did not utter the "magic words," as trial counsel argued, the Commonwealth would have been without a viable aggravating circumstance. Accordingly, because trial counsel had a reasonable basis for not objecting here, Appel-

lant's claim with respect to this issue was properly denied by the PCRA court.

### 5. The PCRA Court Committed an Abuse of Discretion in Refusing to Permit the Defense to Amend Appellant's PCRA Petition Two Years after the Evidentiary Hearing Was Conducted.

Almost two years after the evidentiary hearing, Appellant filed a petition with the PCRA court requesting permission to supplement the record with an affidavit signed by Dr. Callery.[10] Appellant also requested that Dr. Callery be permitted to testify that he could not opine to a reasonable degree of medical certainty that the victim had been raped. In an order dated July 27, 2006, the PCRA court denied the petition. Appellant contends that the PCRA court committed an abuse of discretion in denying his petition because the contents of Dr. Callery's affidavit and his proposed testimony directly refute the finding that Appellant raped the victim. In addition, Appellant complains that the petition should have been granted in the interests of justice given that Appellant's rape conviction served as the only basis for finding the aggravating circumstance set forth at 42 Pa.C.S. § 9711(d)(6). Finally, Appellant asserts that he is entitled to relief because of the ineffectiveness of trial counsel who, Appellant claims, failed to conduct an investigation into whether the victim had been raped.

The PCRA court, in addressing this claim in its Rule 1925(a) opinion, declared that no relief was due because Appellant was seeking to introduce Dr. Callery's affidavit and testimony solely to re-litigate the issue of whether the evidence was sufficient to support the rape conviction, a claim this Court rejected on direct appeal. *Miller*, 724 A.2d at 901. Thus, the PCRA court ruled that the claim was not cognizable under the

10. In the affidavit Dr. Callery avers in part, "I cannot state to a reasonable degree of medical and scientific certainty that Ms. Miller was raped at or around the time she was killed. To the extent that my testimony in this case appears to conflict with any of these conclusions, my actual opinion at the time of trial is stated in this affidavit." Appendix to Appellant's Brief, Exhibit 7, paragraph 4.

PCRA.[11] PCRA Court Opinion, 11/2/07, 9–10. The PCRA court further indicated that Dr. Callery's apparent retraction of his trial testimony does not establish that trial counsel was ineffective and that the record, even without Dr. Callery's testimony, supported the finding that Appellant had raped the victim. PCRA Court Opinion, 11/2/07, 10–11.

Before we may review any of Appellant's arguments, we must determine whether the PCRA court was correct in holding that the claim was previously litigated. If we determine the PCRA court properly held the claim was previously litigated, we are precluded by the PCRA from reviewing it. *See Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 617 (2007) (holding that previously litigated claim is not cognizable under the PCRA); *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 708 (1998) (same). The difficulty here is that Appellant has raised two claims that do not allege ineffective assistance of counsel: he alleges that the PCRA court committed an abuse of discretion in denying his petition and that the court should have granted his petition in the interests of justice. To further complicate matters, Appellant's claim of ineffective assistance of counsel contains no discussion of these issues and states that trial counsel was ineffective for failing to interview Dr. Callery and investigate whether a rape had occurred. Appellant's Brief, 48–49.

A review of the two claims not alleging ineffective assistance of counsel leads ineluctably to the conclusion that they comprise an issue that was previously litigated, namely, whether the evidence was sufficient to support Appellant's rape conviction. This becomes readily clear upon reviewing Appellant's brief and the material he sought to introduce. For example, Appellant argues that the PCRA court abused its discretion because it denied Appellant the opportunity "to demonstrate that the prosecution was without any competent evidence of the commission of rape." Appellant's Brief, 45. He also claims that the interests of justice demand that he be granted

11. An issue has been previously litigated if "the highest appellate court in which the petitioner was entitled to review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2).

relief with respect to "this issue" so that he may be given an opportunity to rebut the testimony of the medical examiner. Appellant's Brief, 47.

In *Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564 (2005), this Court defined the term "issue" for purposes of the PCRA as follows:

> That term, as used in "pleading and practice," is understood to mean "a single, certain, and material point, deduced by the allegations and pleadings of the parties, which is affirmed on the one side and denied on the other." Black's Law Dictionary, 6th ed. 831. Thus, "issue" refers to the discrete legal ground that was forwarded on direct appeal and would have entitled the defendant to relief. *See, e.g., Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) (defining "grounds" as "a sufficient legal basis for granting the relief sought by the applicant"). The theories or allegations in support of the ground are simply a subset of the issue presented. Stated another way, there can be many theories or allegations in support of a single issue, but ultimately, § 9544(a)(2) refers to the discrete legal ground raised and decided on direct review. Thus, at the most basic level, this section prevents the relitigation of the same legal ground under alternative theories or allegations. *See, e.g., Commonwealth v. Wilson,* 452 Pa. 376, 305 A.2d 9 (1973) (concluding that a new theory in support of the same claim of trial counsel ineffectiveness was unavailing since the claim was decided adversely to petitioner in his previous direct appeal); *Commonwealth v. Slavik,* 449 Pa. 424, 297 A.2d 920 (1972) ("A defendant is not entitled to relitigate the validity of his plea every time he offers a new theory or argument which he had not previously advanced.").

888 A.2d at 570. Here, insofar as Appellant sought to introduce the material in question to demonstrate that the evidence was insufficient to sustain Appellant's rape conviction, the PCRA court was correct in finding that it was precluded from addressing the issue because it had been previously litigated.

*See Miller,* 724 A.2d at 901. Thus, no error was committed by the PCRA court in denying relief with respect to Appellant's first two claims.[12]

▪▪▪ Although Appellant's first two claims are not cognizable because they concern issues previously litigated, the same is not true with respect to Appellant's ineffectiveness claim. In *Collins, supra,* we ruled that claims of ineffective assistance of counsel constitute separate and distinct issues that may be raised in a collateral proceeding attacking the verdict. *Collins,* 888 A.2d at 570. Such claims are to be analyzed pursuant to the three-prong ineffectiveness test generally applicable to such claims. *Id.* at 573.

An application of that test to the instant claim indicates that Appellant is not entitled to any relief. Appellant argues that the claim has arguable merit based on an assertion that had trial counsel sought out experts or "interviewed Dr. Callery, there is a reasonable probability that Dr. Callery would have given him the same information he provided to undersigned counsel, and counsel could have moved to exclude his testimony on rape as not competent, due to an insufficient level of certainty." Appellant's Brief, 48. However, Appellant's argument amounts to nothing more than mere speculation. There is no indication in the record that Dr. Callery would have advised trial counsel before the trial commenced that it was his belief that no rape occurred if only trial counsel had interviewed him. In fact, according to the PCRA court, Dr. Callery twice affirmed at two previous hearings that it was his opinion that a rape occurred despite vigorous cross-examination by trial counsel. PCRA Court Opinion, 10. Thus, Appellant is not entitled to relief as he has failed to establish that trial counsel was ineffective for the reasons stated.

12. Appellant claims that these issues have not been previously litigated because the "issue of Dr. Callery's testimony reaching 'reasonable medical certainty' was never raised." Appellant's Brief, 47. It is clear from reviewing Appellant's Brief, together with the evidence he argues was erroneously excluded, that these claims concern the sufficiency of the evidence.

### 6. A New Trial Should Be Granted Because Appellant's Waiver of His Right to a Jury Trial and His Right To Testify Were Inadequate.

It is Appellant's position that a new trial should be awarded because the ineffectiveness of trial counsel rendered his waiver of his right to a jury trial and his waiver of his right to testify unknowing and unintelligent and thus invalid. According to Appellant, he "could not knowingly and intelligently waive a jury trial [or his right to testify] given [trial] counsel's dearth of investigation and the wealth of information that was available to counsel but of which counsel was unaware." [13] Appellant's Brief, 50. In addition, Appellant submits that because trial counsel's pre-trial investigation was inadequate, counsel "could not have properly advised Appellant to waive his right to a jury trial." Appellant's Brief, 50.

Appellant is entitled to no relief with respect to this issue because we have held that trial counsel was not ineffective for the reasons stated by Appellant. Moreover, Appellant has failed to meet the prejudice prong of the ineffectiveness test here since he never alleged or proved that but for counsel's alleged ineffectiveness he would not have waived a jury trial. *See Commonwealth v. Mallory*, 596 Pa. 172, 941 A.2d 686, 697 (2008) (holding that in order to meet the prejudice prong of the ineffectiveness test, a defendant alleging that a jury waiver colloquy was deficient must establish that the outcome would have been different, *i.e.*, that but for counsel's ineffectiveness he would not have waived a jury trial); *Commonwealth v. Lassiter*, 554 Pa. 586, 722 A.2d 657, 663 (1998) (Opinion Announcing the Judgment of the Court) (stating that this Court cannot presume that a defendant would have chosen a jury trial; burden is on defendant to set forth a

13. Appellant's claim that trial counsel's ineffectiveness vitiated his waiver of the right to a jury trial and to testify are premised on the claims of ineffectiveness raised in Appellant's previous issues, including trial counsel's failure to investigate expert and lay testimony supporting a heat of passion defense, expert and lay testimony indicating that a rape did not occur, and expert and lay testimony indicating that Appellant suffered from brain damage. Appellant's Brief, 50.

38

factual predicate establishing same before relief may be granted).

Notably, a review of the record of the jury waiver hearing demonstrates that Appellant's waiver comported with the law. A valid waiver of the right to a jury trial must contain evidence that the accused understood the fundamental essentials of a jury trial which are: "1) that the jury be chosen from members of the community (*i.e.,* a jury of one's peers), 2) that the accused be allowed to participate in the selection of the jury panel, and 3) that the verdict be unanimous." *Commonwealth v. Houck,* 596 Pa. 683, 948 A.2d 780, 787 (2008); *see also Mallory, supra.* Instantly, the record demonstrates that Appellant signed a written jury waiver colloquy form that set forth the essential elements of a jury trial and explained all of the rights Appellant was waiving by deciding to be tried by a judge and not a jury. In addition, the trial court questioned Appellant twice on the record regarding his decision to waive his right to a jury trial. N.T. 9/24/97, 2–20; N.T. 9/29/97, 9–12. On both occasions, Appellant averred that he understood the rights associated with the right to a jury and that he was waiving them knowingly, intelligently, and voluntarily. In this regard, Appellant's waiver of his right to a jury trial appears to be unassailable.

Appellant's contention that his waiver of his right to testify was invalid lacks merit for the same reason that the foregoing claim did, namely, Appellant has failed to prove that but for trial counsel's ineffectiveness, he would have testified. Claims alleging ineffectiveness of counsel premised on allegations that trial counsel's actions interfered with an accused's right to testify require a defendant to prove either that "counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf." *Commonwealth v. Nieves,* 560 Pa. 529, 746 A.2d 1102, 1104 (2000). *See also Commonwealth v. Uderra,* 550 Pa. 389, 706 A.2d 334 (1998).

By not testifying at the evidentiary hearing, Appellant has placed this Court in the position of having to guess whether counsel's ineffectiveness interfered with his right to testify. Furthermore, trial counsel testified at the evidentiary hearing that he asked Appellant to testify both at trial and during the penalty hearing and Appellant refused. N.T. 10/27/03, 77–78, 80. We may not engage in speculation on this issue and thus Appellant's claim is meritless.

## PENALTY PHASE ISSUES

7. **Appellant's Waiver of a Jury for the Penalty Phase Was Invalid; Trial Counsel Was Ineffective for Not Objecting to the Waiver Colloquy and for Not Raising the Issue on Appeal.**

Appellant argues that he is entitled to the reversal of his death sentence and a remand for a new penalty hearing because the jury waiver colloquy was insufficient and did not adequately and comprehensively advise him of the rights he was waiving and the salient differences between the guilt and penalty phases of a capital case. Appellant complains that in questioning him, the trial court did not advise him that if the jury could not agree upon a penalty verdict, a sentence of life imprisonment would be recorded and also that mitigating circumstances could be found individually by each of the jurors. Appellant's Brief, 59–60. Thus, he claims that his waiver was unknowing and unintelligent. In addition, Appellant accuses trial counsel of providing ineffective assistance of counsel for not objecting to the allegedly defective colloquy and for not arguing on appeal that that a new penalty was warranted because the waiver colloquy was incomplete.

The record of Appellant's trial indicates that the trial court conducted three separate colloquies of Appellant, one on September 24, 1997, one on September 29, 1997, and one on October 2, 1997. The final colloquy occurred immediately prior to the commencement of the penalty hearing. N.T. 10/2/97, 284–86. No objection was made as to the inadequacy of the colloquies at any time nor was the issue raised on

appeal. Thus, for purposes of the PCRA, the claim was waived because it could have been raised previously. *See* 42 Pa.C.S. § 9544(b). Consequently, in order to obtain relief on this claim Appellant was obliged to establish that trial counsel was ineffective for not proffering an objection asserting that the colloquies were legally insufficient for the reasons stated by Appellant.[14] *Commonwealth v. Gribble,* 580 Pa. 647, 863 A.2d 455 (2004). *See also Commonwealth v. Rainey,* 593 Pa. 67, 928 A.2d 215, 228 (2007). A review of the record indicates that Appellant has failed to meet his burden of proving that trial counsel was ineffective because he has failed to establish that he was prejudiced by counsel's alleged ineffectiveness.

In the discussion of the previous issue, we referred to *Mallory, supra.* In *Mallory,* this Court held that in order to establish prejudice in a matter alleging that a jury waiver colloquy was deficient, a defendant must establish that, but for counsel's ineffectiveness, he or she would not have waived the right to a jury trial. As we have already stated, the record is devoid of evidence demonstrating that Appellant would have elected to have a jury decide his sentence had trial counsel not been ineffective. Since the failure to establish even one of the three requirements of the ineffectiveness standard under-mines an ineffective assistance of counsel claim, it is clear that Appellant is entitled to no relief on this issue. *Cook, supra.*[15]

### 8. Trial Counsel Was Ineffective for Failing to Investigate and Present All Available Mitigating Evidence During the Penalty Hearing

Appellant contends that trial counsel was ineffective because he failed to investigate and present readily available evidence

---

14. As noted above, trial counsel represented Appellant on appeal. Thus, Appellant is excused from having to "layer" his claims of ineffectiveness, *i.e.,* assert that both trial counsel and appellate counsel were ineffective for failing to raise and preserve this issue.

15. Having ruled that Appellant has failed to establish prejudice, we need not consider the adequacy of the waiver colloquy at issue. Moreover, we reject Appellant's additional claim that the prejudice stemming from trial counsel's failure to object was that at least one juror may have voted to impose a life sentence. Appellant's Brief, 63. *See Mallory, supra.*

of Appellant's child abuse, family dysfunction, mental health deficits, brain impairment, problems while in school, and "complex and tragic" relationship with the victim.[16] Appellant's Brief, 65, 77. Appellant also asserts that trial counsel should have introduced evidence showing that Appellant had a brain lesion removed in 1984, attended drug treatment programs, had a history of drug abuse, and the victim obtained an "order of Attachment of Income" against Appellant just prior to the slaying. Appellant's Brief, 77. Appellant also faults trial counsel for not interviewing and/or calling as witnesses during the penalty hearing his mother Agnes Miller, his sisters, Glenna Saganich, Linda Drew, and Brenda Sue Pennington, his brother Kenneth Miller, his daughter Barbara Miller, and the victim's sister Helen Pennington. Through these witnesses, Appellant claims, trial counsel could have convinced the trial court, sitting as factfinder, to enter a sentence of life imprisonment.

During the penalty hearing, after the Commonwealth presented evidence that Appellant had been convicted of rape and victim-impact testimony from Appellant's daughter, Barbara Miller, Appellant presented the testimony of four witnesses, Dr. Gerald Cooke, Kenneth Miller, Deborah Miller, and Agnes Miller. Dr. Cooke, a clinical and forensic psychologist, testified that he examined and interviewed Appellant on August 14, 1997, taking from him a personal history and administering a battery of tests. During the interview, Appellant related that he was the youngest of eight children and that his father was an alcoholic who was abusive to his mother. Appellant often attempted to protect his mother from his father, which, according to the doctor, caused Appellant to have problems in school and with anger management. N.T. 10/2/97, 297. Regarding school, Appellant told the doctor that he dropped out in eighth grade because of trouble with his behavior. Appellant also indicated that he had a good work history having worked mainly as a heavy machine operator and a truck

16. Appellant also asserts that trial counsel was ineffective for not investigating and presenting expert testimony to rebut that a rape occurred. This claim mirrors that raised in Issue 2 above. Consequently, there is no need to discuss it a second time here.

driver. Appellant admitted that he had a substance abuse problem that involved both drugs and alcohol that began in his teens. *Id.* at 298–99. Although Appellant stated that he underwent both drug and alcohol rehabilitation, Appellant told the doctor that he again took up both habits some months after undergoing treatment. Appellant admitted to Dr. Cooke that at the time of the incident he was injecting heroin daily and using methamphetamine occasionally. *Id.* at 299. Appellant denied having any significant medical history. *Id.* at 300.

Appellant also related to the doctor that he had been arrested for assault on two occasions because of incidents involving his wife. One of the incidents, which resulted in Appellant's incarceration, arose when Appellant became angry because the victim reneged on a promise to seek help for her own drug and emotional problems. *Id.*

Based on the testing he performed, Dr. Cooke estimated that Appellant's intelligence quotient ranged between 81 and 89. *Id.* at 303. Testing also revealed that Appellant had low self-esteem and a need to be accepted which led him to seek constant attention. *Id.* at 304. Dr. Cooke diagnosed Appellant as having a paranoid personality disorder with antisocial and explosive features. *Id.* at 305. He also added second and third diagnoses of drug dependence and alcohol abuse. *Id.* With regard to mitigating circumstances, Dr. Cooke opined that Appellant was incapable of conforming his behavior to the requirements of the law and that his use of drugs and alcohol[17] on the day of the incident played a role in the murder. *Id.* at 306–07. He also stated that Appellant could make an adequate adjustment in prison. *Id.* at 303. Finally, Dr. Cooke testified that he found no evidence that Appellant "suffered from a thinking disorder or psychosis or any kind of major affective disorders such as major depression or manic disorder." *Id.* at 296.

Kenneth Miller, Appellant's brother, testified that he often observed Appellant and the victim together and they seemed to be happy. Appellant also appeared to have a good relation-

17. Appellant allegedly consumed twelve beers and ingested a gram of methamphetamine.

ship with his children. *Id.* at 319–20. Kenneth Miller stated that if Appellant were sentenced to death, it would greatly affect him and his family.

Deborah Miller, Appellant's sister, testified that it appeared to her that Appellant and the victim appeared to be happy and that their relationship was good. *Id.* at 321. She also stated that when Appellant was released from prison, he appeared to be happy and relieved that he could reunite with his family. *Id.* at 322.

Agnes Miller, Appellant's mother, told the trial court that Appellant was hard working and a loving father. *Id.* at 323. She stated that Appellant's children were having problems because of the incident and that if Appellant were sentenced to death, it would exacerbate those problems. *Id.* at 324. In addition, Agnes Miller's trial testimony was incorporated into the record for purposes of the penalty hearing. *Id.* at 286–87. At trial, she testified that Appellant's marriage to the victim was good at its inception but that it deteriorated because of drug and alcohol use. N.T. 9/29/97, 30. Agnes Miller denied having any knowledge that Appellant and the victim were violent toward one another. *Id.* at 33.

At the evidentiary hearing, Appellant presented the testimony of several family members as well as that of various experts. Agnes Miller testified about the violence inflicted on her by her husband and Appellant's attempts to intervene. She also testified that there were problems in Appellant's marriage to the victim. She stated that Appellant's trial attorney did not ask her about her relationship with her husband or about the state of Appellant's marriage and that if counsel had done so, she would have agreed to speak to him. N.T. 10/28/03, 355–69. Agnes Miller conceded that the only time she saw Appellant act abnormally was usually when he was using drugs. *Id.* at 373.

Barbara Miller, Appellant's daughter, testified about her parents and their relationship. She stated that they often fought because her mother complained about not having enough money to support the family because Appellant spent

it on drugs. Although she was angry with her father, Barbara indicated that she would have testified for him at the penalty hearing had she been asked to do so. *Id.* at 376–93; N.T. 10/29/03, 397–414.

Kenneth Miller testified that Appellant grew up in a household headed by a violent alcoholic father who took little interest in Appellant. The family was poor which further stigmatized them in the eyes of their schoolmates. According to Kenneth, Appellant began drinking at age nine and quickly graduated to using drugs. Kenneth also testified about Appellant's marriage. He stated that Appellant and the victim had a history of breaking up and reconciling, that they both used drugs, and that they grew apart from the Miller family as their marriage progressed. N.T. 10/29/03, 482–501. Kenneth stated that Appellant was able to hold a job and never exhibited any behavior indicating that he had mental limitations. *Id.* at 503–05.

Appellant's sisters, Glenna Saganich, Brenda Sue Pennington, and Linda Drew each reiterated much of what Kenneth testified to concerning Appellant's home life. They all testified that they were never interviewed about Appellant's background and that had they been asked to testify about it, they would have been available to do so. Helen Pennington, the victim's sister, testified about the state of Appellant's marriage and stated that Appellant worked double shifts so that the victim could stay home, that Appellant and the victim sold drugs, that the victim had relationships with other men, and had an abortion after she was impregnated by another man. All of these witnesses testified that they were not interviewed and that they would have testified for Appellant if asked to do so.

Appellant called two experts to the stand during the evidentiary hearing for purposes of establishing that trial counsel was ineffective in preparing for the penalty hearing. Dr. Carol Armstrong, a neuropsychologist, testified that she conducted neuropsychological testing of Appellant and found evidence that he suffered from brain impairment in the areas of motor control, verbal ability, and reasoning skills, among

others. N.T. 10/27/03, 121–22. These deficits, according to the doctor, had an impact on his reasoning and judgment skills and affected cognition and behavior. *Id.* at 124. The doctor opined, to a reasonable degree of psychological certainty, that Appellant's brain deficits constituted an extreme mental or emotional disturbance and substantially impaired his ability to conform his conduct to the law. *Id.* at 129. Dr. Armstrong further testified that because Appellant was the product of a violent home, an abuser of drugs and alcohol, had a low I.Q. score, had trouble in school, had a motorcycle accident in his teens, and had a scalp lesion removed in 1984, trial counsel should have had Appellant undergo neuropsychological testing. *Id.* at 115–17.

Dr. Julie Kessel, a board certified psychiatrist, substantiated what Dr. Armstrong stated, namely that Appellant suffered from a substantially impaired capacity to conform his conduct to the requirements of the law and that he was under the influence of extreme mental or emotional distress. N.T. 10/29/03, 548. She based her finding on Appellant's upbringing, substance abuse problem, brain impairment, and relationship with the victim, which according to the doctor, affected his impulse control on the night of the slaying. *Id.* at 535–37, 548.

Trial counsel also testified at the evidentiary hearing. He indicated that he had no strategic reason for not seeking Appellant's school or drug treatment records. N.T. 10/27/03, 23, 25. He stated that he did not speak to Barbara Miller (Appellant's daughter) prior to trial because she was a young child and because he ascertained from other family members that she did not possess any useful information. *Id.* at 25. Regarding Appellant's medical records, trial counsel testified that after speaking to Appellant and other members of his family, he believed that he had been fully apprised of Appellant's history and thus had all of the information he needed. *Id.* at 30.

When asked why he did not have Appellant tested by a neuropsychologist for brain damage when he was aware that Appellant was a drug user, trial counsel replied that he saw no

evidence that would cause him to suspect that Appellant suffered from brain damage or mental infirmity. *Id.* at 40, 61. He based his decision on his interaction with Appellant, who was able to converse intelligently with him, on speaking with members of Appellant's family, and the contents of the report prepared by Dr. Cooke, who found Appellant did not suffer from any thinking disorder, psychosis, or any major affective disorders. *Id.* at 43, 56, 62–63. He also stated that he decided not to present a diminished capacity or intoxication defense based on his conversations with Appellant who provided details of the crime and his reasons for committing it. *Id.* at 45–47. Trial counsel stated that he had no reason for not seeking out and interviewing other members of Appellant's and the victim's family other than that he believed he had received sufficient information from Appellant and the family members to whom he spoke. *Id.* at 30. Finally, he testified that he decided that it would not be in Appellant's best interests to argue that Appellant killed his wife because Appellant grew up in a dysfunctional home and his father had abused his mother. *Id.* at 67–69.

After considering the testimony presented by Appellant and his arguments in favor of the grant of a new penalty hearing, the PCRA court denied Appellant relief on his claim that trial counsel had been ineffective with respect to the penalty phase of the proceedings. The PCRA court determined that there was nothing of record, either from Appellant or from his family, that established that "trial counsel knew or should have known about the [Appellant's] possible brain damage." PCRA Court Opinion, 6/30/07, 13. The PCRA court also concluded that Appellant had not been prejudiced by trial counsel's failure to investigate and present evidence that Appellant suffered from brain damage because the record is devoid of any evidence demonstrating that a mental impairment affected his judgment at the time of the incident. *Id.* at 13–14.

Regarding the allegation that trial counsel had been ineffective for not interviewing members of Appellant's family and the victim's sister, the PCRA court declared that trial counsel

had not been ineffective because the anticipated testimony of these witnesses would have been cumulative of testimony presented by Dr. Cooke. *Id.* at 30. The PCRA court further stated that trial counsel had acted reasonably in not premising Appellant's defense on the evidence relating to Appellant's abusive childhood and family history. The PCRA court noted that trial counsel did present such evidence and that counsel correctly surmised that such evidence would not have swayed the court to find that Appellant killed his wife because he grew up in a dysfunctional household and had been abused as a child. *Id.* at 30–31.

With respect to the allegation that trial counsel should have interviewed Appellant's daughter and called her as a witness, the PCRA court ruled that trial counsel had not been ineffective for not interviewing and calling her to testify. The court held that she would not have been a helpful witness for the defense because she was very angry about her mother's death, appeared during the penalty hearing to disagree with trial counsel's argument that Appellant should not receive the death penalty, and testified for the Commonwealth during the penalty hearing. *Id.* at 32–33.

The PCRA court further stated that trial counsel was not ineffective for failing to obtain and introduce Appellant's school, medical, and drug treatment records or the record of the support order. Counsel was not ineffective, according to the court, because Dr. Cooke testified to Appellant's low I.Q. and trial counsel knew about and introduced evidence of Appellant's drug problems. *Id.* at 31. It was not derelict of trial counsel not to obtain Appellant's medical records, according to the PCRA court, because there was no indication that Appellant suffered from a mental illness. *Id.* Finally, the PCRA court proclaimed that the failure to introduce evidence pertaining to the support order did not constitute ineffectiveness because there was no evidence of record establishing that Appellant knew of the issuance of the order. *Id.*

The standards applicable to claims alleging that counsel was ineffective for failing to investigate and present mitigating

48

evidence was recently set forth in *Commonwealth v. Natividad,* 595 Pa. 188, 938 A.2d 310, 331 (2007), as follows:

As this Court has observed, the United States Supreme Court has held that the Sixth Amendment requires capital counsel "to pursue all reasonably available avenues of developing mitigation evidence." *Commonwealth v. Gorby,* 589 Pa. 364, 909 A.2d 775, 790 (2006) (*citing Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). Counsel must exercise reasonable professional judgment, and in examining counsel's conduct, "we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence ... was itself reasonable." *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767, 784 (2004) (*quoting Wiggins,* 539 U.S. at 523, 123 S.Ct. 2527, 156 L.Ed.2d 471).

938 A.2d at 331. In addition, this Court has stated:

Strategic choices made following less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. In undertaking the necessary assessment, reviewing courts are to take all reasonable efforts to avoid the distorting effects of hindsight. *See Commonwealth v. Basemore,* 560 Pa. 258, 289, 744 A.2d 717, 735 (2000). Nevertheless, courts must also avoid "*post hoc* rationalization of counsel's conduct." *Wiggins,* 539 U.S. at 526–27, 123 S.Ct. at 2538.

*Sattazahn,* 952 A.2d at 655–56 (citation omitted).

Finally, the "reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable attorney to conduct a further investigation." *Steele, supra; see also Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767 (2004) (holding that while counsel has a duty to conduct a reasonable investigation, reasonableness of investigation may be dependent on information supplied by the defendant).

Appellant has not shown that trial counsel acted unreasonably by not interviewing and presenting the testimo-

ny of the witnesses identified above. Trial counsel did investigate evidence of Appellants childhood circumstances, marital relationship, and drug abuse, and introduced evidence pertaining thereto during the penalty hearing. In addition, trial counsel introduced through Dr. Cooke the witnesses who testified during the penalty hearing, and Appellants written background history and statement concerning Appellants life history, the abuse Appellant observed and was subject to while growing up, as well as evidence of his drug use. This Court has consistently held that trial counsel cannot be deemed ineffective for failing to present mitigating evidence that merely would have been cumulative of evidence that was presented during a penalty hearing. *Commonwealth v. Whitney*, 550 Pa. 618, 708 A.2d 471, 477 (1998); *see also Commonwealth v. Abdul–Salaam*, 570 Pa. 79, 808 A.2d 558, 562 n. 5 (2001). Consequently, Appellant cannot meet the arguable merit requirement of the ineffectiveness test.[18]

In addition, Appellant has failed to establish that had trial counsel interviewed these witnesses and presented their testimony, a different outcome likely would have resulted. Appellant presented nothing that established that the trial court would have imposed a life sentence if only it had heard additional evidence of appellants childhood, drug dependence, and dysfunctional marital relationship.

Appellant also cannot establish that trial counsels failure to obtain and review the various records identified above constituted ineffective assistance of counsel or that the PCRA court committed an error of law in ruling that trial counsel was not ineffective for failing to obtain that material. According to Appellant, trial counsel should have obtained Appellants school records because it showed that Appellant had an I.Q. in the high seventies to low eighties and thus was

18. Although Appellant claims that the mitigation evidence presented during the penalty hearing amounted to a "hollow shell" of the available evidence, and therefore, counsel should be declared to have been ineffective for failing to gather it, Appellant ignores the lower court's finding that the additional evidence would not have resulted in a different verdict.

borderline mentally retarded. Appellants Brief, 81. Appellant ignores Dr. Cooke's testimony that he measured Appellants I.Q. in a range from 81 to 89, thereby demonstrating that Appellant, though of limited mental ability, was clearly not mentally retarded. Moreover, the fact that Appellant was able to hold jobs that required at least a modicum of skills demonstrated that Appellants school records would not have resulted in a different outcome had counsel obtained them and introduced them during the penalty hearing.[19] In view of the foregoing, Appellant has failed to establish that trial counsel acted unreasonably by not obtaining these records.

Next, trial counsel cannot be faulted for failing to obtain Appellants medical records. Trial counsel testified that he received no information from Appellant or members of his family alerting him to the fact that Appellant had suffered any injury or had medical problems affecting cognition. In addition, Appellant denied having any significant medical history when examined by Dr. Cooke. N.T. 9/30/97, 300. It is therefore clear that trial counsel cannot be faulted for failing to obtain evidence of which he had no reason to be aware. *See Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 45–46 (2002) (holding that counsel cannot be deemed ineffective for failing to obtain records "uniquely" in possession of defendant and his family); *see also Commonwealth v. Johnson*, 572 Pa. 283, 815 A.2d 563, 581 (2002) (plurality) (this Court refuse[s] to deem trial counsel ineffective for failing to present mitigation evidence that he did not know existed); *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 735 (2000) (same); *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373, 383 (1986) (same).

With respect to Appellants drug records, trial counsel was not ineffective for failing to obtain them because Appellant has failed to establish that had counsel obtained them, the outcome of the penalty hearing would have been different. This is the case because Appellant has failed to show that

19. Appellant's brother Kenneth testified that he never observed anything suggesting that Appellant was mentally challenged. N.T. 10/29/03, 503–05.

these records contained any substantial information different from that already presented to the trial court. Moreover, trial counsel was aware of Appellants substance abuse problem and introduced evidence about it to the trial court. As noted above, counsel cannot be found ineffective for failing to introduce evidence that is merely cumulative of evidence already introduced into the record.

Finally, Appellant failed to establish that he had knowledge that a support order had been issued against him. Without such proof, Appellant cannot demonstrate that the issuance of the support order influenced his behavior on the night of the incident. Thus, Appellant cannot establish that trial counsel was ineffective for failing to obtain the order or introduce proof of its issuance during the penalty phase. *See Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726 (2004) (holding that claims of ineffectiveness cannot be sustained in a vacuum).

Appellants claim that trial counsel was ineffective for failing to have him tested by a neuropsychologist also lacks merit. The record herein indicates that trial counsel had Appellant examined by a psychologist (Dr. Cooke) whose examination of Appellant failed to uncover any mental disabilities. As noted above, Dr. Cooke testified that he found no evidence that Appellant "suffered from a thinking disorder or psychosis or any kind of major affective disorders such as major depression or manic disorder." N.T. 10/2/97, 296. In addition, neither Appellant nor any member of his family advised trial counsel that Appellant suffered from neurological or mental deficits. Given these circumstances, trial counsel cannot be faulted for not securing additional testing of Appellant.

In *Commonwealth v. Stevens*, 559 Pa. 171, 739 A.2d 507 (1999), trial counsel was accused of having been ineffective because he failed to provide all available records to his expert witness. According to the defendant, had trial counsel provided the additional records to his expert witness, it may have resulted in a "more thoroughly developed mental health miti-

gation case." 739 A.2d at 519. This court rejected the defendant's assertion that trial counsel had been ineffective and stated:

We agree with the trial court that Appellant has failed to prove, by a preponderance of the evidence, that the preparation and presentation by trial counsel of the mental health expert testimony was constitutionally ineffective. Appellant relies on the benefit of hindsight and downplays the diagnoses available to his counsel at the time his case was tried. Counsel testified that he provided Dr. Altman, who was his primary mental health expert, with as much information as he had, including substantial information concerning Appellant's social history and prior mental health problems. He relied on Dr. Altman to present the most favorable mental health mitigation case available, and he attempted to present this and the other expert testimony in a manner that would be understandable to, and believed by, the jury. Indeed, Appellant's counsel succeeded insofar as the jury found the Section 9711(e)(2) mitigator. This is not an instance where counsel failed to present a mental health mitigation case despite the presence of evidence to support such a case. *Compare Commonwealth v. Smith,* 544 Pa. 219, 675 A.2d 1221 (1996), *cert. denied,* 519 U.S. 1153, 117 S.Ct. 1090, 137 L.Ed.2d 223 (1997). Rather, this is a case where a more competent evaluation by the professionals retained by Appellant may have resulted in a more thoroughly developed mental health mitigation case. However, our review of the PCRA hearing indicates that such failures, if any occurred, do not rest at the feet of Appellant's counsel, and that the court properly denied Appellant's claim of trial counsel's ineffectiveness.

*Id.*

Instantly, as in *Stevens,* Appellant is arguing that trial counsel should have done more even though he had no tangible reason for doing so. Trial counsel testified that in his dealings with Appellant and Appellants family, he failed to

discern anything that would have caused him to believe that Appellant had brain deficits. This belief was confirmed by Dr. Cookes examination of Appellant.[20] Given these circumstances, trial counsel cannot be faulted for not having Appellant examined by additional experts because the investigation he conducted was reasonable and failed to reveal any evidence showing that Appellant suffered from a mental disease or defect requiring further investigation. *See Commonwealth v. John Wesley Brown,* 582 Pa. 461, 872 A.2d 1139, 1150 (2005) (holding that where record at time of trial indicates that accused was not suffering from mental illness, counsel has no duty to investigate issue further); *Uderra,* 706 A.2d at 339–40 (holding that trial counsel was not ineffective for not introducing in mitigation evidence regarding defendants psychological problems because defendant failed to disclose them prior to trial). Accordingly, we conclude that the PCRA Court did not err in finding no merit to Appellants claim that trial counsel was ineffective during the penalty phase of the proceedings.

### 9. Trial Counsel Was Ineffective for Failing to Object to the Introduction of Victim Impact Evidence During the Penalty Hearing

Appellant complains that trial counsel was ineffective for not objecting to the presentation of victim impact testimony during the penalty phase of the trial.[21] Appellant asserts

---

**20.** Appellant's brother Kenneth denied that Appellant suffered from mental deficits. N.T. 10/29/03, 503–05.

**21.** "Generally, only those statements which describe qualities of the victim and are designed to show the victim's uniqueness as an individual fall within the rubric of 'victim impact evidence.'" *Commonwealth v. Hall,* 582 Pa. 526, 872 A.2d 1177, 1185 (2005); *see also Commonwealth v. McNeil,* 545 Pa. 42, 679 A.2d 1253, 1259 n. 11 (1996). During the penalty hearing, Barbara Miller, the daughter of Appellant and the victim, held a picture of the victim as she testified and showed it to the trial judge when asked to do so by the prosecutor. N.T. 10/2/97, 289–90. In addition, the prosecutor commented that other family members declined a request that they testify because doing so would be too emotional. The prosecutor also stated that the victim's death had a "tremendous and terrible impact on [the victim's] family." N.T. 10/2/97, 291.

such testimony was inadmissible and should not have been presented because the comments of the prosecutor were inflammatory. In addition, Appellant claims that because the offense herein occurred prior to the effective date of relevant amendments to 42 Pa.C.S. § 9711, he is entitled to a new penalty hearing. *See Commonwealth v. McNeil,* 545 Pa. 42, 679 A.2d 1253 (1996) (holding that victim impact testimony was inadmissible in cases originating prior to the 1995 amendment to 42 Pa.C.S. § 9711).

No relief is due on this claim because Appellant failed to meet his burden of proving that trial counsels failure to object to the prosecutors actions prejudiced him. First, the actions and comments of the prosecutor were innocuous insofar as they were fleeting and did not dwell on the victim. In numerous cases, this Court has refused to find prejudice under similar circumstances. *See Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 414 (2003) (holding that brief victim impact testimony indicating that victim was "peaceful" and "nice" was not prejudicial); *see also Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 447 (1999) (same).

Appellant cannot prove prejudice for a second reason. The PCRA court, sitting as factfinder, indicated that it was not influenced by the victim's photograph or the prosecutor's comments and that neither the photograph nor the comments had any effect on the verdict it ultimately rendered. PCRA Court Opinion, 6/30/07, 37–38. It is presumed that a trial court, sitting as factfinder, can and will disregard prejudicial evidence. *See Commonwealth v. Davis,* 491 Pa. 363, 421 A.2d 179, 183 (1980); *Commonwealth v. David Brown,* 886 A.2d 256 (Pa.Super.2005). Thus, because Appellant has failed to prove that the outcome of the proceedings would have been different had trial counsel lodged an objection, he is not entitled to relief with respect to this claim.[22]

22. We note that a review of the prosecutor's closing argument during the penalty phase indicates that the prosecutor did not comment upon the evidence he presented during the penalty hearing. N.T. 10/2/97, 325–29.·

*PCRA COURT ERRORS*

### 10. The PCRA Court Committed an Abuse of Discretion in Refusing to Allow Appellant to Introduce into Evidence or Even Marking as an Exhibit Certain Records During the PCRA Hearing.

Appellant argues that the PCRA court committed reversible error by refusing to permit the defense to mark as an exhibit and introduce into evidence medical records pertaining to the victim, which indicated that she had undergone an abortion five years prior to the date of the slaying and that someone other than Appellant impregnated her. According to Appellant, the records should have been admitted because Appellant believed that his wife had been unfaithful and the evidence was relevant with respect to whether the killing was committed in the heat of passion. Appellant's Brief, 93.

The PCRA court declared that it committed no error in refusing to permit the defense to introduce the records because they were irrelevant; they contained information remote in time from the date of the incident and contained no information indicating that Appellant was aware that the abortion took place or his reaction to that information. PCRA Court Opinion, 11/2/07, 6–7. The PCRA court refused to allow the defense to mark the records as an exhibit to protect the victim's privacy. *Id.* at 5. The PCRA court also noted that the defense did introduce testimony during the PCRA hearing indicating that the victim had an abortion and told others that Appellant had not fathered the child. N.T. 10/29/03, 512–17, 540–43, 594–97. We find no error in the rationale employed by the PCRA court, and we therefore hold this claim is meritless.

### 11. The PCRA Court Erred in Applying the Rape Shield Law to Exclude Testimony that the Victim Was Impregnated by Someone Other than Appellant.

During the evidentiary hearing Appellant's counsel asked trial counsel whether Appellant told him that the victim had had an abortion after getting pregnant by another man. The

Commonwealth objected arguing that the Rape Shield Law, 18 Pa.C.S. § 3104, prohibited the dissemination of such information and that the information the defense was seeking to elicit was irrelevant because the alleged abortion occurred five years prior to the slaying. The PCRA court sustained the objection. N.T. 10/27/03, 28–30. Appellant asserts that the PCRA court erred by sustaining the Commonwealth's objection because it relied upon the Rape Shield Law to do so.

This claim is meritless. The PCRA court explained in its Pa.R.A.P. 1925(a) opinion that it did not sustain the Commonwealth's objection based on the application of the Rape Shield Law but rather on relevancy and hearsay grounds. PCRA Court Opinion, 11/2/07, 5. Moreover, during the PCRA hearing the PCRA court later acknowledged that the Rape Shield Law did not apply and could not be used to exclude evidence relating to the victim's medical history. N.T. 10/29/03, 426–27. In addition, since other witnesses later testified at the PCRA hearing that the victim had an abortion after being impregnated by another man, any error resulting from the PCRA court's ruling constituted harmless error. Accordingly, Appellant is entitled to no relief on this claim.

12. **The PCRA Court Abused Its Discretion in Refusing to Provide the Defense with Certain Evidence Including the Negatives of the Crime Scene Photographs.**

Appellant submits that the PCRA court committed an abuse of discretion when it refused to order the Commonwealth to provide the defense with a computer disc containing high-resolution digitized scans of the negatives of the crime scene photographs. Appellant asserts that he requested the negatives be digitally scanned onto a disc because the negatives contain detail that may not appear in a photograph and the scanned negatives can be more closely examined. Appellant's Brief, 95–96. According to Appellant, by denying this request, the PCRA court hindered him in his attempt to prove that the victim was not raped, when rape served as the basis for the sole aggravating circumstance found by the trial court.

The PCRA court denied Appellant's request because the Commonwealth provided the defense with copies of the crime scene photographs, "first generation" prints of the photographs, and a contact sheet containing copies of the negatives. PCRA Court Opinion, 11/2/07, 7. The PCRA court also relied on the fact that the Pennsylvania State Police, the governmental agency having possession of the negatives, did not have equipment to scan the negatives onto a disc and the contact sheet containing the negatives were of a quality on a par with digital scans. *Id.* We find no error in the rationale employed by the PCRA court to deny this claim and therefore hold that the trial court did not commit an abuse of discretion.

 Rule 902(E)(2) of the Pennsylvania Rules of Criminal Procedure provides:

(E) Requests for Discovery

(2) On the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause.

Pa.R.Crim.P. 902(E)(2). The denial of a defense request seeking discovery materials is reviewed under an abuse of discretion standard. *Sattazahn*, 952 A.2d at 662; *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 261 (2006). In *Commonwealth v. Baumhammers*, 599 Pa. 1, 960 A.2d 59, 86 (2008), this Court recently discussed "abuse of discretion," stating:

In *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745 (2000), we reiterated the well-known definition of "abuse of discretion" as follows:

The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but

where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

960 A.2d at 86 (citation omitted). The application of this definition to the instant matter leads us to conclude that the PCRA court did not commit an abuse of discretion in refusing to provide the digitized negatives to the Appellant. According to the trial court, the defense was provided with whatever photographic evidence the Commonwealth had in its possession. Moreover, the Commonwealth did not have the equipment needed to comply with Appellant's request. Under the circumstances, Appellant's claim is meritless.

## *CUMULATIVE EFFECT OF THE ERRORS*

### 13. The Cumulative Effect of the Errors in This Case Entitles Appellant to Relief.

In his final claim, Appellant argues that he is entitled to relief because of the cumulative prejudicial effect of the errors he alleged and raised in this appeal. This Court has repeatedly stated that "no number of failed claims may collectively warrant relief if they fail to do so individually." *Washington*, 927 A.2d at 617; *see also Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 56 (2008). Therefore, this issue is without merit.

## *CONCLUSION*

Accordingly, we affirm the ruling issued by the PCRA court denying Appellant's request for post-conviction collateral relief.[23]

Justices BAER, TODD, and McCAFFERY join the opinion.

23. The Prothonotary of the Supreme Court is directed to transmit the entire record in this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

Chief Justice CASTILLE files a concurring opinion in which Justice EAKIN joins.

Justice SAYLOR files a dissenting opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion, with the exception of the points addressed below. I write separately to express my minor disagreement with the Majority's analysis of two of appellant's claims and to address a recurring and important point raised in Mr. Justice Saylor's dissenting opinion. My reasoning follows:

### Claim V

Claim V faults the PCRA court on procedural grounds, for refusing to permit appellant to amend his PCRA petition in order to present testimony from Dr. Callery at the PCRA hearing related to his changed opinion as to whether a rape occurred.

Like Justice Saylor, I disagree with the Majority's resolution of this claim grounded upon the sufficiency of the evidence and the Majority's related conclusion that the claim has been previously litigated. Appellant's claim clearly challenges the PCRA court's procedural ruling and the related claim of trial counsel ineffectiveness for failing to challenge the competency of Dr. Callery's testimony, rather than the sufficiency of the evidence supporting the rape conviction.

Nevertheless, I concur in the result. I disagree with the Majority's characterization of the claim as previously litigated, since the substance of appellant's challenge is to the PCRA court's ruling that denied his late request to supplement the PCRA petition with Dr. Callery's changed testimony. This claim has not been previously litigated as it relates to a procedural ruling by the court immediately below. However, I see no abuse of discretion in denying the belated request to supplement the petition, and I do not see why Dr. Callery's alleged changed opinion (or "elaboration" as appellant would

have it) was necessary to the substantive claims which sound in ineffective assistance of counsel.[1]

### Claim VI

In this claim, appellant alleges that trial counsel's ineffectiveness rendered invalid his waiver of his right to a jury trial and his right to testify. Appellant develops this claim primarily in terms of the jury waiver, faulting counsel's advice to waive, and then, respecting the right to testify, merely states that "[t]he exact same [sic] reasoning applies to his waiver of the right to testify." Brief of Appellant, 50. Although I join the Majority Opinion concerning this dual claim, I would also briefly note that in ruling on appellant's claim of ineffectiveness related to his right to testify, the PCRA court concluded that the claim was without merit, since appellant opted not to testify despite counsel's advice to the contrary. While the Majority notes this fact in passing, it intimates that we would have to "guess whether counsel's ineffectiveness interfered with [appellant's] right to testify" and that we will not engage in such speculation. Respectfully, I see no need to go that far, given that the PCRA court aptly pointed out that counsel cannot be deemed ineffective, since he encouraged appellant to testify, only to have appellant refuse. Thus, in this instance, any complaint regarding appellant's decision not to testify is placed squarely on appellant's shoulders and cannot support a claim of trial counsel ineffectiveness. Appellant inexplicably fails to account for this dispositive fact in asserting that his twin claims depend on the same reasoning.

### Claim VIII

I join the Majority on this claim and write only to address two points raised by Justice Saylor's Dissenting Opinion. First is the role of recent decisions from the U.S. Supreme Court rendered on federal *habeas* review of state court convic-

---

1. I am also convinced by the PCRA court's alternative rationale that there was sufficient circumstantial evidence supporting the rape, as explained by the PCRA court earlier in the opinion, when it states that even without the testimony of Dr. Callery, the evidence was sufficient. Thus, I agree with the Majority's observation that appellant cannot establish that he was prejudiced by trial counsel's alleged ineffectiveness. *See* Majority Op. at 32–35, 987 A.2d at 657–58.

tions, such as *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (1999), *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). I have explicated in much greater detail elsewhere that, by definition, these decisions cannot be interpreted as establishing any new federal constitutional rule or standard. *See Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1148 (2008) (Castille, C.J., concurring). Rather, the High Court in these decisions merely "applied" the governing ineffectiveness standard that was set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to the facts of cases tried after *Strickland* became the law of the land. Indeed, the High Court most recently confirmed that this was the case in a unanimous *per curiam* opinion rendered in *Bobby v. Van Hook*, 558 U.S. ——, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009), when it applied the *Strickland* "effective assistance of counsel" standard in reviewing an ineffectiveness claim based upon counsel's alleged failure to prepare adequately for the penalty phase. Notably, the Court emphasized both the flexibility of the *Strickland* standard as well as *Strickland*'s teaching that counsel's conduct must be judged according to standards in place at the time counsel acted:

> The Sixth Amendment entitles criminal defendants to the "effective assistance of counsel"—that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." That standard is necessarily a general one. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.

*Van Hook*, 558 U.S. at ——, 130 S.Ct. at 16.[2] Furthermore, the *Van Hook* opinion stressed that reasonableness can only

---

**2.** Although Justice Alito wrote a separate concurring opinion in one case, he began the responsive opinion by stating, "I join the Court's *per*

be assessed in light of the **prevailing professional norms at the time of trial** by making clear that a court should not look to ABA guidelines that were announced eighteen years after the trial. Indeed, the Court made it abundantly clear that ABA guidelines should not be treated as "inexorable commands" with which all capital defense counsel must fully comply, but are " 'only guides' to what reasonableness means, not its definition." *Id.* at ——, 130 S.Ct. at 17.

Additionally, the Court's review in *Wiggins, Williams* and *Rompilla* was specifically circumscribed by the terms of the Antiterrorism and Effective Death Penalty Act (AEDPA), which authorizes federal courts to upset final state judgments only if the state court analysis of a federal claim is contrary to, or involves an unreasonable application of, existing, binding precedent from the High Court. Observers can and do debate whether the court majorities in *Wiggins, Williams* and *Rompilla* were faithful to AEDPA's deference standard—notably all of these decisions, involving a controlling question of whether a state court judgment was objectively reasonable, were sharply divided. What cannot be debated is that: (1) the cases did not purport to break new constitutional ground; and (2) the decisions bind us, and they are important because those cases, like the more recent pre-AEDPA decision in *Van Hook,* stand as the High Court's directive as to what was commanded by *Strickland* itself. *See also Porter v. McCollum,* 558 U.S. ——, ——, 130 S.Ct. 447, 452, 175 L.Ed.2d 398, —— (2009) (confirming capital defendant only entitled to relief if he can establish that the state court's rejection of his ineffectiveness claim was "contrary to or involved an unreasonable application of" *Strickland* ).

Obviously, any court addressing a case posing materially identical circumstances would be hard-pressed to deviate from the holding in a *Strickland*-application case decided under

*curiam* opinion. . . ." Justice Alito would give no "special relevance" to the 2003 ABA Guidelines in determining whether an attorney's performance meets the standard for effective representation required by the Sixth Amendment. *Van Hook,* 558 U.S. at ——, 130 S.Ct. at 20.

AEDPA. *See Porter, supra* (explaining that relief was warranted because the case was similar to *Wiggins* as "counsel did not even take the first step of interviewing witnesses or requesting records"). But, quite frankly, there is no easy answer to the question of what to do with good faith decisions rendered by courts in the long years between when the Court announced *Strickland* in 1984, and then announced what it necessarily meant in cases such as *Wiggins, Williams, Rompilla,* and now *Van Hook* and *Porter.* In that long interregnum, courts operating in perfectly good faith may have rendered decisions that now seem to be in tension with some of the Court's later *Strickland*-application decisions.

Theoretically, since the *Strickland*-application decisions by definition purport to establish no new law, the continuing validity of a pre-*Wiggins* decision should be measurable by comparison to *Strickland* itself. In point of fact, the High Court signaled as much when commenting on its *Wiggins* and *Rompilla* decisions in light of the *Strickland* standard in *Van Hook* by stating:

> This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, *cf. Wiggins,* 539 U.S., at 525, 123 S.Ct. 2527, or would have been apparent from documents any reasonable attorney would have obtained, *cf. Rompilla v. Beard,* 545 U.S. 374, 389–93, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than already was in hand" fell "well within the range of professionally reasonable judgments."

*Van Hook,* 558 U.S. at ——, 130 S.Ct. at 19. Similarly, in *Porter,* the Court was clear that the inquiry was guided by whether the Florida Supreme Court "**unreasonably applied** *Strickland*." *Porter,* 558 U.S. at ——, 130 S.Ct. at 453 (emphasis added). Thus, the most recent jurisprudence confirms that *Strickland* remains the ultimate test by which we as a court must measure claims of ineffectiveness.

For my part and consistently with the High Court's most recent pronouncements, I do not believe that we are required to jettison past approaches, analyses, or holdings in this Court's *Strickland* cases, unless: (1) they are squarely precluded by a decision from the U.S. Supreme Court, such as *Strickland,* which existed when we rendered our decision; or (2) it is beyond reasonable debate that our decision is both materially identical to, and contrary to, one of the later *Strickland*-application decisions. In this case, I have no difficulty with the Majority's application of our precedent.

Second, the Dissenting Opinion expresses concern with appellant's argument that the admission of appellant's written "background history and statement" was materially prejudicial, and suggests that trial counsel's strategy in proffering the statement was "seriously misguided." Dissenting Op. at 68, 987 A.2d at 679. Although ultimately the admission of the statement may not have advanced appellant's cause, I would merely add that trial counsel's statements at the PCRA hearing reveal that he was struggling with the manner in which he could proffer appellant's version of the events leading up to and on the night in question, since appellant had refused to testify. N.T., 10/27/03, at 78. Counsel believed that the best way to do this was to urge appellant just to "[tell] things as it was [sic]" by writing a statement in his own words, explaining the events leading up to and on the night in question. *Id.* at 66. Based on the circumstances facing counsel, I would not find counsel ineffective with respect to this decision.

Justice EAKIN joins this concurring opinion.

Justice SAYLOR, dissenting.

I dissent, since it appears to me that the majority opinion does not sufficiently address material arguments or conform to prevailing law in a number of areas.

### Guilt Phase

*Claim I*—The majority first rejects Appellant's claim of deficient stewardship in the investigation and presentation of evidence that the victim was killed in the heat of passion,

reasoning that, even if Appellant's additional evidence were credited, "it is clear that the evidence still was insufficient to conclude that the killing was committed in the heat of passion as the record is devoid of evidence that at the time the victim was murdered, Appellant was acting under a sudden or intense passion brought on by the victim." Majority Opinion at 22, 987 A.2d at 650. The majority's rationale, however, conflicts with the PCRA court's (and fact finder's) reasoning in addressing Appellant's ineffectiveness claims, in which that court praised trial counsel for doing "an exceptional job of getting evidence and argument regarding heat of passion into the record." PCRA Court Opinion, *slip op.* at 29.

In this regard, the majority's substantive analysis concerning the unavailability of a heat-of-passion defense also does not take into account: whether there is any role for individual characteristics of the defendant in the analysis (such as whether a defendant is mentally retarded or brain damaged); the extent to which the cumulative impact of a series of events may be considered in assessing provocation, *see Commonwealth v. McCusker*, 448 Pa. 382, 389 & n. 8, 292 A.2d 286, 289 & n. 8 (1972); or various of the actual events alleged by Appellant and, to one degree or another, reflected in evidence of record. These include Appellant's release from incarceration a short time before the killing; his initial residence with his mother; Appellant's daughter's, the victim's, and her sister's alleged efforts to entreat him back into a relationship with the victim; Appellant's emotional uncertainty but eventual acquiescence; the service of a support order on Appellant on the day of the killing; the allegation that the victim previously had aborted another man's child during the marriage; and/or the number and nature of the victim's wounds, which tend to support his theory that he lost control.[1] I also differ with the majority's characterization of the above circum-

1. In the statement presented to the trial judge at the penalty hearing, and in his conversations with the penalty-phase and post-conviction experts, Appellant also related that the event immediately precipitating the killing was the victim's indication—just after having engaged in sexual relations with Appellant—that he was to leave the marital residence and that another man would be moving in with her. *See* N.T., October 2, 1997, Ex. D-4; N.T., October 29, 2003, at 446.

stances, to the degree they might be accepted by a fact finder, as being analogous to "a history of minor disputes and allegations of past infidelity." Majority Opinion at 22, 987 A.2d at 651.

For the above reasons, and in the absence of a more directed assessment of Appellant's arguments as summarized above, I am unable to join the majority's disposition of the first claim.

*Claim 2*—The majority next rejects the claim that trial counsel was ineffective for failing to investigate and present expert testimony to rebut the Commonwealth's assertion that the victim was raped, crediting trial counsel's belief that "the evidence made it pellucidly clear to him that no rape occurred and ... his belief that anyone who reviewed the evidence would draw the same conclusion he did." Majority Opinion at 26, 987 A.2d at 653. The difficulty with trial counsel's, and the majority's, position is that counsel's beliefs proved to be demonstrably erroneous, as a Commonwealth expert witness described the killing as a "classic rape-homicide" and the fact finder correctly found "ample evidence to prove that a rape occurred even without Dr. Callery's testimony," PCRA Court Opinion, *slip op.* at 10, with this Court confirming on direct appeal that the verdict on the offense of rape was consistent with the evidence. *See Commonwealth v. Miller*, 555 Pa. 354, 367–68, 724 A.2d 895, 901 (1999). Moreover, hindsight is not required to question counsel's confidence, as well as his corresponding decision to forego further preparation, in light of the circumstances surrounding Appellant's crimes, where there was undisputed evidence of intercourse and substantial circumstantial evidence of forcible compulsion. Indeed, at least in the absence of the assessments provided by Appellant's post-conviction experts, it is difficult to consider trial counsel's belief that no fact finder would render a verdict of guilt on the rape charge to be rational, let alone reasonable.

*Claim 5*—Claim 5 concerns Appellant's challenge to the PCRA court's refusal to permit Dr. Callery to testify in the post-conviction proceedings that he did not hold the opinion that a rape had occurred to a reasonable degree of scientific certainty. The majority indicates that "[t]here is no indication

in the record that Dr. Callery would have advised trial counsel before the trial commenced that it was his belief that no rape occurred if only trial counsel had interviewed him." Majority Opinion at 36, 987 A.2d at 659. The majority's reasoning, however, is unresponsive to the argument presented. Appellant's argument is that trial counsel failed to adduce that Dr. Callery did not hold his opinions to the requisite degree of scientific certainty to justify their admission into evidence. *See* Brief for Appellant at 39–42. Appellant supports his contention, *inter alia*, with the testimony of post-conviction experts and Dr. Callery's own declaration indicating:

3. In my view, the evidence in this case that I reviewed, and was aware of, is plainly consistent with any of the following scenarios: that intercourse occurred before Ms. Miller was killed and then she was killed; that intercourse occurred while she was being stabbed; or that intercourse occurred after she had been killed.

4. Because of the number of plausible scenarios, I do not hold the opinion to a reasonable degree of medical and scientific certainty that Ms. Miller was killed while the assailant was engaging in sexual intercourse with her. I cannot state to a reasonable degree of medical and scientific certainty that Ms. Miller was raped at or around the time she was killed. To the extent that my testimony in this case appears to conflict with any of these conclusions, my actual opinion at the time of trial is stated in this affidavit.

\* \* \*

7. Mr. Miller's trial attorney did not interview me before I testified in Mr. Miller's case. If he had, I would have told him the things I say in this affidavit and testified to them on the witness stand.

Declaration of Richard T. Callery, M.D., dated January 26, 2005. I cannot support a disposition based on an inaccurate characterization of a claim.

## Penalty Phase

*Claim 8*—In resolving Appellant's claim that his trial counsel was ineffective for failing to investigate and present avail-

able mitigating evidence during the penalty hearing, the majority initially appears to approve trial counsel's investigation. *See* Majority Opinion at 47–49, 987 A.2d at 666–67. Trial counsel testified, however, that he did not obtain various available life history records; he interviewed only two family members prior to trial; he interviewed another for the first time in the courthouse prior to his testimony; he did not obtain a copy of the file for the domestic relations case involving Appellant and the victim; and he did not consider investigating the psychiatric significance of his client's claim to having suffered a blackout during the course of the killing. N.T., October 27, 2003, at 22–32, 100. It therefore seems apparent to me from the record that counsel acquired a rudimentary knowledge from a narrow set of sources, a practice disapproved by the United States Supreme Court. *See Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 2537, 156 L.Ed.2d 471 (2003).

The majority next couches the post-conviction evidence as merely cumulative of the evidence presented at trial. *See* Majority Opinion at 47–49, 987 A.2d at 666–67. I believe, however, there are qualitative differences in the evidence which should be recognized. In my view, the post-conviction evidence presented a better case for life than that which was presented at trial, particularly in terms of the depth of the explanatory-type mitigation presented through the experts.[2]

The majority also credits trial counsel for presenting Appellant's written "background history and statement" concerning Appellant's life history, the abuse Appellant observed and was subject to while growing up, as well as evidence of his drug use. *See* Majority Opinion at 47–49, 987 A.2d at 666–67. The majority, however, ignores Appellant's substantial argument, as follows, that the document, in fact, was materially prejudicial:

> [T]rial counsel affirmatively *harmed* Appellant by presenting to the Court a "statement" hand-written by Appellant which could not possibly have aided Appellant in his case for life. The statement . . . contained numerous profanities and

---

**2.** It is a separate question, discussed below, whether the degree of difference is enough to justify a finding of prejudice. Presently, my focus is on the majority's cumulativeness determination.

was interpreted by the trial court in its sentencing deliberations as shifting the responsibility for the incident to the deceased. Such a statement, presented in a vacuum and without any psychiatric explanation for the paranoia and rage that developed in Appellant during his formative years, could easily have been construed by the court as both disrespectful and void of remorse.[fn] In fact, in its sentencing decision, the lower court stated "I also take note of the total lack of remorse of the defendant in connection with the homicide ... [I]t troubles me that the defendant has expressed no remorse whatsoever in connection with this crime. And in fact, that in the penalty phase of the hearing, the letter that was handed up basically implied that most of the fault belonged on the victim in connection with this matter." NT 10/27/97, at 10–11.

[fn] The presentation of this letter is so tactically harmful that one wonders if counsel read it before handing it over to the judge.

Brief for Appellant at 86–87 (emphasis in original).

In line with Appellant's argument, a review of Appellant's statement confirms that the strategy of presenting it to a fact finder was seriously misguided, because the statement contains a multitude of inflammatory remarks. For example, it is replete with blame cast upon the victim, which the trial judge conveyed both at sentencing and in the post-conviction proceedings was offensive. *See, e.g.,* N.T., October 28, 2003, at 383 (reflecting the trial/PCRA judge's comment, "I'm not going to sit here and listen to this woman be trashed just to present this heat of passion defense mitigated testimony."). Further, although trial counsel was attempting at the penalty hearing to portray the killing as having occurred in the heat of passion, the statement starkly reflects a far deeper and more entrenched disregard, on Appellant's part, for the victim's life. *See, e.g.,* N.T., October 2, 1997, Ex. D–4 (reflecting Appellant's description of a prior assault upon the victim, stating, "This is when I put the gun to Sherry's head and she was lucky she didn't die that day cause I was pissed."). Similarly, in addressing an incident at a bar, Appellant indicates he told a man "if you yell anymore at the women I'm going to ram my

pool stick down your throat." *Id.* Particularly when considered in light of the note Appellant penned in the aftermath of the killing, the "background history and statement" suggests deep-seated violent, volatile qualities, in substantial tension with the defense theory of an isolated, sudden, uncontrollable rage experienced by an otherwise non-violent individual.[3] It is difficult to envision why any competent attorney would put such a statement before the fact finder in the form in which it was presented.

With regard to the distinct matter of trial counsel's failure to obtain a copy of the support order during his penalty investigation, the majority indicates, "Appellant failed to establish that he had knowledge that a support order had been issued against him." Majority Opinion at 61, 987 A.2d at 668. I believe it should at least be acknowledged, however, that Appellant discussed the support order and its impact upon him in his handwritten statement presented to the trial judge at the penalty hearing. *See* N.T., October 2, 1997, Ex. D–4. Thus, there was some evidence (albeit of questionable quality) of knowledge on Appellant's part.

The majority also relies substantially on *Commonwealth v. Stevens,* 559 Pa. 171, 739 A.2d 507 (1999). *See* Majority Opinion at 50–52, 987 A.2d at 668–669. *Stevens,* however, predated the United States Supreme Court's decisions in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and *Wiggins,* 539 U.S. at 510, 123 S.Ct. at 2527, which a number of Justices have indicated reflect a different set of standards than were (and perhaps are) being applied in at least some of our decisions, such as *Stevens.* This implicates the divide concerning the application of *Williams* and *Wiggins* in Pennsylvania, as reflected in *Commonwealth v. Romero,* 595 Pa. 275, 938 A.2d 362 (2007) (plurality in relevant regard). *Compare id.* at 318–19, 938 A.2d at 387–88 (indicating that "[p]rior to *Williams* and its progeny, case law regarding what is required of counsel during the penalty phase was not as exacting as today" and declining to apply *Williams* and

---

3. The statement also reflects that Appellant was an apparently unrepentant drug dealer.

*Wiggins* to cases litigated prior to their issuance), *with id.* at 335–37, 938 A.2d at 398–99 (Saylor, J., concurring and dissenting) (advancing the position that *Williams* and *Wiggins* apply to prior cases, as the decisions were rendered in the post-conviction context and the United States Supreme Court explained in *Wiggins* that it made no new law).

In summary, I do not agree with many of the reasons presented by the majority in support of its decision to affirm the penalty verdict. Moreover, although the PCRA court's analysis may implicitly suggest it would not have rendered a different verdict had the post-conviction evidence been presented to the court at the penalty hearing, I do not agree with the majority that such a finding is explicit in the opinion. *See* Majority Opinion at 49 n. 18, 987 A.2d at 667 n. 18.

Furthermore, the PCRA court's opinion embodies a looseness which is inconsistent with our requirements in capital post-conviction cases. For instance, in its finding that Dr. Armstrong's post-conviction testimony was merely cumulative of the testimony of Dr. Cooke, which was presented at the penalty hearing, the PCRA court indicates that the testimony of both experts reflected the same mitigating circumstance, which it described as a lack of capacity to appreciate criminality and conform conduct to the requirements of the law, 42 Pa.C.S. § 9711(e)(3). *See* PCRA Court Opinion, *slip op.* at 38.[4] The material passage of the opinion, however, fails to recognize that the testimony given by Julie B. Kessel, M.D., psychiatrist, lends support to Appellant's claim of an additional mitigator, namely, that he was under the influence of extreme mental or emotional disturbance at the time of his crimes, 42 Pa.C.S. § 9711(e)(2). *See, e.g.,* N.T., October 29, 2003, at 548. Therefore, the basis for the PCRA court's conclusion on the matter is erroneous. *See generally Commonwealth v. Beasley,* 600 Pa. 458, 489–90, 967 A.2d 376, 395 (2009) (commenting on material imprecision in the decision-

---

4. The actual formulation of the mitigator is: "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law *was substantially impaired.*" 42 Pa.C.S. § 9711(e)(3) (emphasis added).

making of a capital post-conviction court in connection with a remand, indicating, "We intend to provide an orderly system of post-conviction adjudication that produces fair and just results, anchored upon governing law and rational reasoning.").