J-S38037-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
:       PENNSYLVANIA
:
          v.                :
:
:
JAMAAL T. HONESTY            :
:
        Appellant       :   No. 411 EDA 2024

Appeal from the PCRA Order Entered January 12, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000199-2019

BEFORE:   STABILE, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:       **FILED JANUARY 10, 2025**

Appellant, Jamaal T. Honesty, appeals from the order entered by the Court of Common Pleas of Philadelphia County dismissing his first petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  Upon careful consideration, we affirm.

The PCRA court provides an apt summary of relevant facts and procedural history, as follows:

> On the night of November 8, 2018, Raheime Peterson, Diego Salazar and Quran Garner were outside of Reale's Bar on Frankford Avenue in Philadelphia when [Appellant] Jamaal Honesty pulled up in his car and said something to the three, thinking he knew them.  He did not.  Peterson approached the car and words were exchanged.  Appellant exited his vehicle and an argument ensued between Peterson and [Appellant].  The matter escalated and Peterson punched Appellant.  Believing that [Appellant] was trying to get to his gun, Peterson, Salazar and

_____

[*] Former Justice specially assigned to the Superior Court.

Garner ran to Appellant's car, jumped in, and drove away in his vehicle.

Shortly afterwards [Appellant] entered Reale's Bar. [He] was clearly upset, at one point pulling out a gun and waiving it around. Eventually he was escorted out of the establishment. Meanwhile, Peterson had kept Appellant's car, and at about 5:10 p.m. the *next* evening, pulled up in front of his house at 4751 Meridian Street and parked. While Peterson was still sitting in the driver's seat of the car, Appellant approached the vehicle. The lights flashed, as if someone had the key fob to unlock the door, Appellant approached, opened the driver's door and shot Raheime Peterson in the top of the head, fleeing immediately thereafter. Police and medics arrived, and Peterson was taken to Jefferson-Torresdale Hospital where he died three days later of the gunshot wound. Six days after the shooting, Appellant called the police and reported the car was stolen. When taken to homicide, Appellant confessed to killing Mr. Peterson. Appellant was arrested on November 15, 2018, and charged with murder and various firearms violations. He was held for court on all of the charges following a preliminary hearing on January 10, 2019.

A jury trial commenced from February 10th through February 18, 2020, resulting in convictions for murder in the first degree, possessing the instrument of a crime, two counts each of firearms not to be carried without a license and carrying firearms in public in Philadelphia. On the day the verdict was returned, Appellant was sentenced to life in prison without parole for first-degree murder, a consecutive three an on-half to seven years' incarceration for each of the firearms not to be carried without a license as well as a consecutive two and one-half to five years' imprisonment each for possessing the instrument of a crime and carrying firearms in Philadelphia, for an aggregate sentence of life plus fourteen and one-half to twenty-nine years' incarceration. Counsel requested to be allowed to withdraw, which was granted. New counsel was appointed. Post Sentencing Motions were filed and denied on October 6, 2020. A timely appeal was taken to the Superior Court, which granted Appellant's motion to dismiss the appeal on January 15, 2021. *See Commonwealth v. Honesty*, 1978 EDA 2929.

Appellant filed a counseled PCRA petition on October 29, 2021, and supplemented on April 29, 2022. The prosecution motioned to dismiss the petition on June 28, 2023, and after an

- 2 -

independent review of the entire record, the court filed a notice of intent to dismiss pursuant to Pennsylvania Rule of Criminal Procedure 907 on the twelfth day of December. On January 12, 2024, the petition was dismissed which was timely appealed to the Superior Court.

PCRA Court Opinion, 2/20,2024, at 1, 2-3.

Appellant raises the following issues for this Court's review.

I.      The PCRA Court erred in dismissing Appellant's petition where trial counsel was ineffective for arguing to the jury that the lesser verdict of third-degree murder did not apply to Appellant's case, despite strong evidence that Appellant lacked specific intent to kill.

II.     The trial court erred in dismissing Appellant's petition where trial counsel was ineffective for failing to request a jury instruction on defense of property, without which Appellant's self-defense claim was not legally viable. . . .

III.    The trial court erred in dismissing Appellant's petition where trial counsel was ineffective for failing to investigate and present Appellant's extensive trauma history, which directly bore on his mental state at the time of the shooting and supported his self-defense claim.

IV.     The court erred in dismissing Appellant's petition where trial counsel was ineffective for failing to request the appropriate jury instruction despite arguing to the jury that such a verdict was an alternative to first-degree murder.

V.      The court erred in dismissing Appellant's Amended PCRA petition where the cumulative prejudicial effect of trial counsel's errors warrants relief.

Brief of Appellant, at i-ii.

Initially, we note our standard of review.

On appeal from the denial of PCRA relief, our standard of review calls for us to determine whether the ruling of the PCRA court is

supported by the record and free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. The PCRA court's factual determinations are entitled to deference, but its legal determinations are subject to our plenary review.

*Commonwealth v. Nero*, 58 A.3d 802, 805 (Pa. Super. 2012) (quotation marks and quotations omitted).

As relevant here, a PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). In reviewing Appellant's ineffective assistance of counsel claim, we are mindful that, since there is a presumption counsel provided effective representation, the defendant bears the burden of proving ineffectiveness. *Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282 (2010).

To prevail on an ineffective assistance claim, a defendant must establish "(1) [the] underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his [client's] interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." *Id.*, *supra*, 10 A.3d at 291 (citations omitted).

> We need not analyze the prongs of an ineffectiveness claim in any particular order. Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the

- 4 -

applicable facts and circumstances of the case. [C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.

*Commonwealth v. Johnson*, 635 Pa. 665, 139 A.3d 1257, 1272 (2016) (citations omitted). *See Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 419 (2009) ("A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.") (citation omitted). "A claim has arguable merit where the factual averments, if accurate, could establish cause for relief." *Commonwealth v. Stewart*, 84 A.3d 701, 707 (Pa. Super. 2013) (*en banc*) (citation omitted).

Further, "[t]o demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding. *Commonwealth v. Spotz*, 624 Pa. 4, 84 A.3d 294, 311-12 (2014) (citations, quotation marks, and quotations omitted). *See Commonwealth v. Gribble*, 580 Pa. 647, 863 A.2d 455, 472 (2004) ("[A] defendant [raising a claim of ineffective assistance of counsel] is required to show actual prejudice; that is, that counsel's ineffectiveness was of such magnitude that it could have reasonably had an adverse effect on the outcome of the proceedings.") (quotation omitted).

In Appellant's first issue, he contends trial counsel rendered ineffective assistance when, during his closing argument to the jury, he failed to argue that Appellant lacked the specific intent to kill Mr. Peterson and stressed, instead, that the compromise verdict of third-degree murder did not apply

because evidence did not demonstrate Appellant acted with malice. According to Appellant, the jury's multiple questions during deliberations seeking from the trial court clarification on the charge of third-degree murder revealed that it may have chosen the lesser, compromise verdict but for counsel's stated position against it.

Specifically, Appellant argues "[t]he trial record contains compelling evidence that Appellant did not intend to kill the decedent, but rather approached him to reclaim his stolen vehicle then fired once, reflexively, when the decedent lunged toward Appellant." Brief of Appellant, at 25. Therefore, he posits counsel deficiently elected to focus exclusively on a trial strategy that Appellant acted in self-defense, either justifiably or, in the alternative, with a sincere but unreasonable belief of his need to do so, without arguing he lacked the specific intent to kill. Counsel advanced this strategy through a narrative that Appellant acted without malice when he sought to reclaim his vehicle from Peterson by approaching the driver's side with gun extended for his protection, asking Peterson to desist, and firing only when Peterson lunged at him.

We do not agree that this strategy was without a reasonable basis given evidence of Peterson's participation in the forcible theft of Appellant's car coupled with the uncontested content of surveillance video depicting Appellant's approach of the vehicle with his gun at the ready, opening the driver's door, and shooting Peterson at close range in the head when Peterson

appeared to move toward him.[1]  Third-degree murder "includes any unlawful killing of a human being with malice but where no intention to actually kill exists or can reasonably and fully be inferred from the circumstances." *Commonwealth v. Williams,* 980 A.2d 510, 524 (Pa. 2009).  Arguing to the jury that the compromise verdict of third-degree murder was inappropriate under the present facts because Appellant's actions reflected not malice but, instead, either a justifiable belief or, at worst, a sincere but unreasonable belief that lethal gunfire was necessary to defend his life as he attempted to retake his motor vehicle was not an unreasonable strategy.

Indeed, the jury received an instruction that malice was also an element to the charge of first-degree murder, so the relevance of counsel's repudiation of malice in this case was not necessarily limited to the charge of third-degree murder.   The jury also was instructed that a specific intent to kill a victim may be inferred from a defendant's use of a deadly weapon on a vital part of the victim's body,  *see, e.g., Commonwealth v. Anderson*, 323 A.3d 744, 753 (Pa. 2024) (acknowledging this well-accepted statement of law), and there was no dispute that Appellant shot decedent in the head from an extremely close distance that he chose to create between himself and

---

[1] Appellant points to his testimony in which he stated, "I tried to ask [Peterson] to get out of the car so I could just take my car back, and then when he lunged at me, you know, it was a reaction."  Brief of Appellant at 26.  To the extent Appellant assails the jury's decision to reject his own testimony of events depicted on a surveillance video viewed by the jury, we observe that the trial court has previously rejected his weight and sufficiency of the evidence challenges on direct appeal.

decedent. Counsel's election to emphasize, therefore, that Appellant fired this shot believing he needed to do so in defense of his own life was not advocacy that fell below the standard of competence required under the circumstances.

Furthermore, defense counsel's closing argument did not prevent the jury from rejecting the Commonwealth's case for first-degree murder in favor of reaching a compromise verdict of third-degree murder. If, as Appellant contends in his brief, there was "strong evidence that Appellant lacked specific intent to kill," the jury remained free to consider its options guided by the trial court's instructions on third-degree murder, imperfect self-defense, and justifiable (perfect) self-defense theories, respectively. Nevertheless, the jury decided that he did not shoot Peterson in the head in reflexive perfect or imperfect self-defense, nor did it conclude that he maliciously fired the shot but without the specific intent to kill, as it was free to do under the trial court's charge for third-degree murder. Even after receiving continued guidance on the charge of third-degree murder when the trial court answered its multiple questions on the charge, the jury resolved that Appellant unjustifiably shot Peterson with both malice and the specific intent to kill.

Defense counsel's argument to the jury was consistent with a reasonable defense strategy on evidence that Appellant sought to retake his stolen car from Peterson and, without malice, was forced to fire his gun in self-defense when Peterson appeared to move toward him. The jury still received instruction on third-degree murder and ample clarification of the instruction during its deliberations that it could find third-degree if, upon its

review of all evidence—including the surveillance video evidence—it found that Appellant's actions reflected not the specific intent to kill but a recklessness and hardness of heart consistent with the element of malice cabined under third-degree murder. Nevertheless, it returned a verdict of first-degree murder. We discern no arguable merit to Appellant's first issue.

In Appellant's second issue, he couches within an overarching charge of trial court error an ineffective assistance of counsel claim assailing trial counsel's decision to forgo a jury instruction on defense of property pursuant to Pa.C.S.A. § 507, "Use of force for the protection of property", without which, he argues, Appellant's self-defense claim was not tenable. Because Appellant's conduct did not accord with all defense-of-property conditions in Rule 507, we cannot conclude that defense counsel lacked a reasonable basis for forgoing the formal charge.

Appellant argues that effective presentation of Appellant's self-defense/imperfect self-defense defense necessarily depended on a Rule 507-based defense-of-property theory to dispute the notion that he provoked the deadly encounter between himself and Peterson when he rushed the vehicle with his gun drawn. This is so because under the defense of property doctrine, he maintains, one does not lose his right to self-defense when his "reasonable force in protection of his property is met with an attack upon his person." Appellate brief at 32 (quoting **Commonwealth v. Young**, 412 A.2d 159 (Pa. Super. 1979)).

Our review, however, confirms that by the very terms of Rule 507 Appellant may not be understood to have engaged in "reasonable force" where his conduct failed to conform with the requisite conditions of Rule 507. Specifically, subsection 507(c)(2) proscribes conduct in defense of movable property when the actor has reason to know the conduct would expose him to substantial danger of serious bodily injury. Indeed, elsewhere, in subsection 507(c)(4)(i)(A), it is clarified that the use of deadly force under the Rule is permitted only when there has been an entry into the actor's dwelling.[2] ***See***

_____

[2] The relevant portions of Rule 507, *infra*, provide that "use of force upon or toward the person of another is justifiable when the actor believes that such force is immediately necessary . . . to retake tangible movable property, if: (i) the actor believes that he . . . was unlawfully dispossessed of such . . . movable property and is entitled to possession; and . . . (B) the actor believes that the person against whom he uses force has no claim of right to the possession of the property. . . . The use of force to prevent or terminate a trespass is not justifiable under this section if the actor knows that the exclusion of the trespasser will expose him to substantial danger of serious bodily injury. The use of deadly force is justifiable under this section if: . . . there has been an entry into the actor's dwelling; the actor neither believes nor has reason to believe that the entry is lawful; and, the actor neither believes nor has reason to believe that force less than deadly force would be adequate to terminate the entry."

The entire text of Rule 507 provides:

> **(a) Use of force justifiable for protection of property.--**The **use of force** upon or toward the person of another **is justifiable when the actor believes that such force is immediately necessary:**
>
> (1) to prevent or terminate an unlawful entry or other trespass upon land or a trespass against or the unlawful carrying away of tangible movable property, if such land or movable property is, or

*(Footnote Continued Next Page)*

- 10 -

is believed by the actor to be, in his possession or in the possession of another person for whose protection he acts; or

**(2)** to effect an entry or reentry upon land or **to retake tangible movable property, if:**
**(i) the actor believes that he** or the person by whose authority he acts or a person from whom he or such other person derives title **was unlawfully dispossessed of such** land or **movable property and is entitled to possession; and**
**(ii) (A)** the force is used immediately or on fresh pursuit after such dispossession; **or**
**(B) the actor believes that the person against whom he uses force has no claim of right to the possession of the property** and, in the case of land, the circumstances, as the actor believes them to be, are of such urgency that it would be an exceptional hardship to postpone the entry or reentry until a court order is obtained.
(b) Meaning of possession**.**--For the purpose of subsection (a) of this section:
(1) A person who has parted with the custody of property to another who refuses to restore it to him is no longer in possession, unless the property is movable and was and still is located on land in his possession.
(2) A person who has been dispossessed of land does not regain possession thereof merely by setting foot thereon.
(3) A person who has a license to use or occupy real property is deemed to be in possession thereof except against the licensor acting under claim of right.
**(c) Limitations on justifiable use of force.--**
**(1) The use of force is justifiable under this section only if the actor first requests the person against whom such force is used to desist from his interference with the property, unless the actor believes that:**
**(i) such request would be useless;**
(ii) it would be dangerous to himself or another person to make the request; or
(iii) substantial harm will be done to the physical condition of the property which is sought to be protected before the request can effectively be made.
**(2) The use of force to prevent or terminate a trespass is not justifiable under this section if the actor knows that the**

*(Footnote Continued Next Page)*

**exclusion of the trespasser will expose him to substantial danger of serious bodily injury.**
(3) The use of force to prevent an entry or reentry upon land or the recaption of movable property is not justifiable under this section, although the actor believes that such reentry or caption is unlawful, if:
(i) the reentry or recaption is made by or on behalf of a person who was actually dispossessed of the property; and
(ii) it is otherwise justifiable under subsection (a)(2).
**(4) (i) The use of deadly force is justifiable under this section if:**
(A) **there has been an entry into the actor's dwelling;**
(B) the actor neither believes nor has reason to believe that the entry is lawful; and
(C) the actor neither believes nor has reason to believe that force less than deadly force would be adequate to terminate the entry.
(ii) If the conditions of justification provided in subparagraph (i) have not been met, the use of deadly force is not justifiable under this section unless the actor believes that:
(A) the person against whom the force is used is attempting to dispossess him of his dwelling otherwise than under a claim of right to its possession; or
(B) such force is necessary to prevent the commission of a felony in the dwelling.
**(d) Use of confinement as protective force**.--The justification afforded by this section extends to the use of confinement as protective force only if the actor takes all reasonable measures to terminate the confinement as soon as he knows that he can do so with safety to the property, unless the person confined has been arrested on a charge of crime.
**(e) Use of device to protect property.**--The justification afforded by this section extends to the use of a device for the purpose of protecting property only if:
(1) the device is not designed to cause or known to create a substantial risk of causing death or serious bodily injury;
(2) the use of the particular device to protect the property from entry or trespass is reasonable under the circumstances, as the actor believes them to be; and
(3) the device is one customarily used for such a purpose or reasonable care is taken to make known to probable intruders the fact that it is used.
*(Footnote Continued Next Page)*

**also** the 1967 Comment to 507, stating, "Apparently one may use as much force as may be necessary to eject a trespasser but is not justified in inflicting serious bodily harm."

Here, there is no dispute that Appellant led with his loaded gun when he ambushed decedent in a claimed attempt to regain his car parked on a neighborhood street. Thus, counsel had reason to conclude that Appellant's actions were unreasonable and, therefore, unjustifiable by the very terms of Rule 507, such that seeking a jury instruction under Rule 507 would serve no rational purpose.

Our jurisprudence supports this conclusion. Specifically, Appellant relies on the Rule 507-based rationale espoused in **Young**, **supra**, that defense of

---

**(f) Use of force to pass wrongful obstructor.--**The use of force to pass a person whom the actor believes to be intentionally or knowingly and unjustifiably obstructing the actor from going to a place to which he may lawfully go is justifiable, if:
(1) the actor believes that the person against whom he uses force has no claim of right to obstruct the actor;
(2) the actor is not being obstructed from entry or movement on land which he knows to be in the possession or custody of the person obstructing him, or in the possession or custody of another person by whose authority the obstructor acts, unless the circumstances, as the actor believes them to be, are of such urgency that it would not be reasonable to postpone the entry or movement on such land until a court order is obtained; and
(3) the force used is not greater than it would be justifiable if the person obstructing the actor were using force against him to prevent his passage.

18 Pa.C.S.A. § 507 (emphasis added).

property may provide justification for using force that would otherwise render an actor an initial aggressor ineligible to present a self-defense claim. The facts of **Young**, however, distinguish it from the present matter.

In **Young**, defendant Young was convicted of voluntary manslaughter on evidence he shot and killed a trespasser on a commercial lot his family owned and operated as an automobile repair shop. Young had approached the trespasser, who, along with his girlfriend, was seated in his car parked on Appellant's lot, and asked him to leave several times, to no avail. The history between Young and the trespasser included several prior trespasses, including one in which the trespasser was seen siphoning gasoline from a vehicle and another where the trespasser threatened to kill Young after Young refused to provide him with a towing device. **Id.** at 161.

Asked again to leave, the trespasser threatened to remove Young's prosthetic leg and "beat him with it." A fight ensued, and, according to Young, when the trespasser gained an advantage and knocked Young backwards and off-balance, Young feared the trespasser would overtake him and remove his leg, which was attached simply with a single strap. Therefore, Young testified, he pulled a gun from his pocket as he was reeling and fatally shot the trespasser.

**Young** is inapposite to the present case. The defendant Young did not invite the confrontation by surprising the habitual, hostile trespasser with a gun pointed in his face. He simply ordered the trespasser off his lot. It was only when the trespasser defiantly refused to leave the lot, acknowledged

Young's physical disadvantage, threatened to remove Young's prosthetic leg and beat him with it, and forcibly put himself in position to do so that defendant Young reached for his gun and fired in defense of his life.

Here, Appellant's initiation of the violent confrontation is less like the facts in *Young* and more like the baseless actions taken by the defendant in *Commonwealth v. Elmer*, 903 A.2d 1273 (Pa. 2006), in which the defendant, who was convicted of simple assault and REAP for his actions taken against trespassers on his hunting grounds, initiated a violent confrontation against trespassing hunters without any immediate need to do so. After the high court acknowledged our justification jurisprudence requires that an actor believe that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person, it held the Commonwealth had disproved Appellant's offer of self-defense with evidence that the defendant was the initial aggressor in the confrontation. Similarly, the Court continued, the Commonwealth had shown the defendant had not acted in a manner necessary to avail himself of a Section 507 defense-of-property defense because there was "not a scintilla of evidence that it was 'immediately necessary' to use force to eject the hunters from Appellant's land." *Id.* at 1280.

As discussed above, the evidence confronting defense counsel was that Appellant clearly could have waited until Peterson exited the vehicle and left the scene and then surreptitiously reclaimed his car with his key fob, or he could have called police once he located his car and allowed authorities to

restore order safely. Like in *Elmer*, there was no immediate need for Appellant to engage decedent in a manner that was very likely to escalate rapidly to risking serious bodily injury or death. Accordingly, we discern no ineffective assistance of counsel for opting against a Rule 507 defense when Appellant engaged in provocative conduct not permitted under the Rule.

In Appellant's third issue, he argues trial counsel rendered ineffective assistance by "failing to investigate and present Petitioner's significant and heart-rending trauma history in support of self-defense (perfect or imperfect)." Brief of Appellant, at 46. According to Appellant, he deserves either a remand to the PCRA court for an evidentiary hearing as to whether trial counsel had a reasonable basis for failing to address this history or a new trial in this matter. We conclude there is no arguable merit to this underlying claim.

> Specifically, Appellant argues:
>
> [a] professionally competent [pretrial] investigation [by trial counsel] would have revealed Petitioner's extensive history of trauma, abuse, and abandonment. Petitioner's childhood was rife with fear and instability, as he was routinely victimized by those around him. Petitioner's basic sense of security was undermined from infancy when, instead of residing in a nurturing home that supported his development, he was removed from his mother's care due to her drug addiction. Petitioner was physically abused by the adults who were charged with caring for him—beaten by his father while held upside down and assaulted by staff at Glen Mills who held Petitioner's hands behind his back so he could not defend himself. Petitioner was sexually assaulted for years beginning when he was only in second grade and too young to physically resist. He grew up oppressed by the constant threat of violence and death, witnessing five murders and coming upon several bodies soon after death. Head injury, early drug use, and

behavioral health issues (including suicidal ideations) also marked Petitioner's childhood. All of these factors, particularly in combination, cause Petitioner to experience heightened alert in threatening situations and diminish his ability to exercise impulse control, to predict the consequences of his conduct, and to make level-headed judgments. There is a direct link between the devastating amount of trauma that petitioner was subjected to and his belief that [he] needed to use deadly force against the decedent in a charged and dangerous situation.

Brief for Appellant, at 48-49.

Our relevant jurisprudence has recognized that to prevail on a justification defense,

> there must be evidence that the defendant "(a) ... reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." *Commonwealth v. Samuel*, 527 Pa. 298, 590 A.2d 1245, 1247–48 (1991); *see* 18 Pa.C.S. § 505; *see also Commonwealth v. Harris*, 550 Pa. 92, 703 A.2d 441, 449 (1997). "The Commonwealth sustains its burden [of disproving self-defense] if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self therefrom; or that the slayer violated a duty to retreat or avoid the danger." *Commonwealth v. Burns*, 490 Pa. 352, 416 A.2d 506, 507 (1980).[]

> The derivative and lesser defense of imperfect belief self-defense "'is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must [be satisfied to prove] unreasonable belief voluntary manslaughter.'" *Bracey*, 795 A.2d at 947 (quoting *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575, 582 (1991)). Thus, for example, if the defendant was not free from fault, neither self-defense nor imperfect self-defense is a viable defense.

- 17 -

***Commonwealth v. Sepulveda***, 55 A.3d 1108, 1124–25 (Pa. 2012).

In the case *sub judice*, the record establishes that Appellant cannot prevail on this claim. Even assuming *arguendo* that the presentation of his mental health history at trial would have borne on whether he held a sincere but unreasonable belief that deadly force was required to save his life, he was also required under his justification defense, including imperfect self-defense voluntary manslaughter, to establish separately that he was free from fault in provoking the difficulty which culminated in the slaying and did not violate any duty to retreat. ***See Commonwealth v. Sanchez***, 82 A.3d 943, 80 (Pa. 2013) (indicating that, to reduce homicide to voluntary manslaughter pursuant to a claim of "imperfect self-defense," the defendant must have held an unreasonable belief that deadly force was required to save his life, and all other principles of justification under 18 Pa.C.S.A. § 505 must still be met).

Appellant does not dispute evidence that on the day after Peterson and the others had stolen his car Appellant elected to track down Peterson while Peterson was operating Appellant's car, follow him to his home, and then—rather than call police or wait to retake the car with his own key after Peterson had vacated it—take Peterson by surprise at gunpoint while he was still seated in Appellant's car. This extreme conduct in which Appellant put himself in obvious danger of serious bodily injury deprived him of the claim that he was free from fault in provoking the difficulty that culminated in Peterson's slaying. Furthermore, Appellant's creation of such extreme circumstances, as noted above, divested him of any justification that may have been available under

18 Pa.C.S.A § 507, protection of property. Consequently, there is no arguable merit to Appellant's underlying claim of ineffective assistance of trial counsel based on counsel's failure to present evidence of Appellant's traumatic youth.

Appellant next asserts that trial counsel ineffectively failed to seek a jury instruction for involuntary manslaughter based on heat of passion. The record supported a heat of passion defense, he maintains, and defense counsel was ineffective for seeking a jury instruction consistent with this defense. Specifically, he argues that a reasonable man would have been sufficiently provoked by the humiliating assault and carjacking Appellant experienced at the hands of defendant and his cohorts to act as he did on the following day. We disagree, as sufficient time separated the underlying fight and spite car theft from Appellant's calculated recovery attempt the next day to have enabled a reasonable person in his position to engage in cool reflection rather than in an armed retaking of the occupied vehicle.

A panel of this Court recently outlined the heat of passion defense as follows:

> With respect to a "heat of passion" voluntary manslaughter instruction under Subsection 2503(a)(1), our Supreme Court has relevantly held:
>
>> [A] voluntary manslaughter instruction is warranted only where the offense is at issue and the evidence would support such a verdict. To support a verdict for voluntary manslaughter, the evidence would have had to demonstrate that, at the time of the killing, [a]ppellant acted under a sudden and intense passion

resulting from serious provocation by the victim.

> ***Commonwealth v. Montalvo***, 604 Pa. 386, 986 A.2d 84, 100 (2009) (internal citations, quotation marks and emphasis omitted). If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder.

***Commonwealth v. Sanchez***, 623 Pa. 253, 82 A.3d 943, 979-80 (2013) (quotation marks and quotations omitted).

> "Heat of passion" includes emotions such as anger, rage, sudden resentment or terror which renders the mind incapable of reason. An objective standard is applied to determine whether the provocation was sufficient to support the defense of "heat of passion" voluntary manslaughter. The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool reflection.

***Commonwealth v. Miller***, 605 Pa. 1, 987 A.2d 638, 650 (2009) (citations and most quotation marks omitted). *See* ***Commonwealth v. Carter***, 502 Pa. 433, 466 A.2d 1328, 1323 (1983) (holding where evidence does not support finding of manslaughter, trial court need not submit issue to jury).

***Commonwealth v. Craig***, No. 2611 EDA 2023, 2024 WL 5164627, at

*5 (Pa. Super. Ct. Dec. 19, 2024).[3]

Here, the Commonwealth contests the present claim by observing that

immediately after Appellant was bested in a mutual fight with decedent and

his friends, he was able to exhibit rational thought by calling 9-1-1 for

---

[3] Pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value.

emergency assistance and reporting coherently to the dispatcher that his car had been stolen, all of which indicated he had not lost all sense of reason even in the initial wake of his victimization. Brief of Commonwealth, at 18. Appellant does not deny this but emphasizes, instead, that the 9-1-1 recording showed he was screaming his report, and he points to evidence he brandished a gun at bar patrons that same night while accusing them of being part of the "set-up" that led to the vehicle theft as additional proof of his raw anger. Brief of Appellant at 46.

Nevertheless, the Commonwealth responds that a heat-of-passion instruction was unwarranted because even if Appellant were angry during the immediate aftermath of his assault and theft the night before, he did not engage in the conduct in question until the following day, thus giving him more than the amount of time a reasonable person in his position would have needed to shed the "sudden and intense passion" requisite to a heat of passion defense and come to a state of cool reflection about the events of the night before. We agree.

The uncontested timeline evidence at trial established that Appellant had a significant cooling off period of many hours prior to his undertaking a plan the following day to track decedent by car and retake his vehicle by a show of potentially lethal force. Under this timeline, Appellant did not make the requisite showing that he was objectively in a state of "sudden and intense passion" when he shot decedent one day following the underlying provocative

event. *See Craig*, *supra* (no arguable merit to claim trial counsel ineffectively failed to object to court's denial of "heat of passion" instruction; no "sudden and intense passion" was demonstrated in defendant Craig's shooting of victim 8 or 9 hours after earlier provocative episode with different parties, as he had sufficient time for cooling off). Accordingly, this argument fails.

Appellant's final issue alleges that the cumulative prejudice from the individual claims he raises entitles him to relief. *See Commonwealth v. Koehler*, 36 A.3d 121, 161 (Pa. 2012) ("When the failure of individual claims is grounded in lack of prejudice, . . . then the cumulative prejudice from those individual claims may properly be assessed." (cleaned up)). Such a standard is applicable, however, only if there are found multiple instances of deficient performance. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009). "[N]o number of failed claims may collectively warrant relief if they fail to do so individually." *Commonwealth v. Anderson*, --- A.3d ----, 2024 Pa. Super. 271, 2024 WL 4759146 (Pa. Super. filed Nov. 13, 2024) (citing *Commonwealth v. Tedford*, 960 A.2d 1, 56 (Pa. 2008)). As we have rejected Appellant's claims for lack of arguable merit rather than for lack of prejudice stemming from deficient performance, there is no basis to conduct the requested accumulation review. *See Johnson*, *supra*.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/10/2025